Milligan, J.,
delivered the opinion of the court:
The claimants seek by this action to recover of the defendants the sum of $1,657 34, on an implied warrantee in the sale of certain lots of “ cotton-pickings,” sold in the city of New York, under the Act 12th March, 1863.
The sale was at public auction, on the 25th of May, 1866, and made both by sample and on published terms. At the same time other cottons were sold by the auctioneer, but in separate lots or parcels. The sale was under a general order to the auctioneer from the United States cotton agent to sell, without special directions or restrictions as to the manner or *108 terms of sale, other than those contained in the printed cata-logue, which was distributed, a' sufficient time before the sale, among the people, for them to take advatage of it. These terms were publicly announced by the auctioneer before the sale began, and, as found in the record, are as follows:
“ Payments for this cotton will be received in cash currency. A deposit of $25 per bale must be made by the purchaser immediately after the sale, and the balance must be paid and the cotton taken away within three days from the time of the sale. It has been classed and sampled by G. W. Amory, who reports the cotton in about the same order as that lately sold by the government. Whenever damage has been perceptable, a fair allowance has been made by the weigh-master. No reclamation will be made.
“The cotton is stored, and can be seen at the following-places: * * * Continental stores, Brooklyn; Phenix stores, and Government stores, Staten Island. Samples can be seen at the salesrooms of John H. Draper & Co., 112 Pearl street.”
The cotton in question was sold in three lots. The first and second lots — each fifty bales — weighing together 32,600 pounds, at 1% cents a pound, amounting to $4,075 75; and the third lot — sixty-nine bales — 26,509 pounds, at 16| cents per pound, amounting to $4,440 25. All three lots were struck off and sold to Thomas & Maltby, and afterward transferred by them to the claimants, who paid the bills and took the order for the cotton.
The cottons thus sold are called in the petition and record “ cotton-pickings,” which are described by the witnesses to be “ refuse or waste cotton that becomes detached from the bales at the warehouse, or wherever it becomes scattered; they are picked up and put in bags or bales, and are called ‘pickings.’”
There is no proof that this cotton was in any other or different order than that previously sold by the government. The samples exhibited on the day of the sale were drawn from the bales in the usual way, and shown to Mr. Maltby, who bid it off; and opportunity was offered to all who desired to purchase at the sale to examine, the cotton in the bale, either before the sale or afterward, and before full payment for the amount purchased.
At the date of the sale, the three lots of cotton struck off to Thomas & Maltby were charged on the books of the auctioneer *109 to them, and some short time thereafter, the purchaser informed the auctioneers that they had procured the claimants to take the cotton, and the bills were paid by their check.
The samples exhibited to the purchasers of this cotton turned out to be much superior to the body of the bales purchased. Complaints of this fact were made to the auctioneer, and also to Mr. Simeon Draper, the cotton agent, but no redress was made by either.. Afterward, in June, and again in October, 1866, the claimants succeeded in selling all three of the lots of cotton -purchased as aforesaid.
The first lot — fifty bales — was sold on the 4th of June, at 14 cents per pound; and the second lot, on the 12th — fifty bales— was sold in two parcels, one, thirty bales, at 16 cents, and the other, twenty bales, damaged and rotten, at '3f cents per pound ; the third lot, or remaining sixty-nine bales, was sold in October following, the first parcel of this lot, fifty-two bales, at 13J cents per pound, and the second, seventeen bales, at 10J.
The reclamation made is confined to the losses sustained on the resale of the twenty bales of damaged and rotten cotton found in the second lot; and the losses on the resale of the sixty-nine bales, or the third lot. The first are shown to have been $523 35, and on the second $1,133 99, making together the sum of $1,657 34.
On this state of facts the principal question relied on in argument by the claimants’ counsel was, that the sale was by sample, and, ás such, an implied warranty accrued to the purchasers that the cotton spld corresponded to the sample in quality and value.
We are not prepared to admit this proposition, nor do we feel called upon to discuss it, further than to say that the facts do not bring the case within the principle of law relied on by the counsel. But the real and paramount question in the case is as to the power of the agent, under whose authority the cotton was sold, to bind the United States in a covenant of warranty of the quality of the article sold, or so to conduct the sale that the law would imply a warranty of anything but of title.
The sale was^.piade under the authority of the Treasury agent, at New York, appointed under the Act 12th March, 1863. The agents appointed under this act are declared to be special agents, and clothed with no general powers. The' *110 law imposes on them the special duty to receive and collect all abandoned or captured property, and to appropriate it to public use, on due appraisement and certificate thereof, or to forward it to a place of sale, and then to sell it at auction to the highest bidder. This act is a public law, and all parties, on well-settled principles, dealing with the agents appointed under it, and charged with the duty of carrying it out, are bound to take notice of its provisions. . •
It is quite clear the scope' of the agent’s authority under the statute was. limited to the specific grants of power therein named, and there is no grant, either express or implied, from which he could derive the authority to bind the government in any warranty whatever other than for title; and having no such power himself, he could confer none on the auctioneer.
In respect to the acts, declarations, and representations of public agents, the same rule does not prevail which governs in relation to mere private agents. As to the latter, the principals are in many cases bound, when they have not authorized the declarations and representations to be made. “But in cases of public agents,” says Judge Story, in his work on Agency, (§ 307 a,) /‘the government, or other public authority, is •not bound, unless it manifestly appears that the agent is acting within the scope of his-authority, or he is held out as having authority to do the act, or is employed in his capacity as a public agent, to make the declaration or representation for the government.”
“ Indeed,” continues the author, “ this rule seems indispensable, in order to guard the public against losses and injuries arising from the fraud or mistake, or rashness and indiscretion, of their agents. And there is no hardship in requiring from private persons, dealing with public officers, the duty of inquiry as to their real or apparent power and authority to bind the government.”
This rule is recognized by the Supreme Court in the case of Lee v. Munroe, (7 Cranch R., 366,) and is conclusive of this case.
We may add, also, that the sale appears to have been conducted in strict conformity to the published catalogue, which expressly provided against all reclamations.
On the whole case there is no ground of recovery against •the government, and the petition must be dismissed.