Milligan, J.,
delivered the opiniou of the court:
The claimant seeks to recover the net proceeds of forty bales of cotton, which he avers in his petition were taken from his plantation in Carroll Parish, Louisiana, in 1864.
The court finds the facts on which the case rests to be as follows, viz:
1. The claimant was the owner of the plantation known as “ Highland Place,” in Carroll Parish, Louisiana, and on which the forty bales of cotton claimed in this action were raised by his own hands in the year 1862.
2. The crop of 1862 amounted to about three hundred and ninety bales, two hundred and forty of which had been ginned by the overseer, and two hundred compressed into bales, which *290 were removed to a cane-thicket for safety, where they were afterward discovered and burned by the rebels.
McGorkle, the overseer, left the plantation in February, 1863, and one James Bland, who was foreman, appears to have taken control. Some short time after McGorkle left, Bland and the colored men on the place compressed the remaining ginned cotton into forty bales, leaving about one hundred and fifty bales of seed-cotton in the gin-house, and hauled the forty bales, now in suit, out to Mrs. Blackburn’s, as the witnesses say, u to save it for their old master, who had been kind to them.” It was stored in Mrs. Blackburn’s back yard, and she promised to take care of it. But, contrary to her promise, some time after she shipped it up to Memphis, Tenn., where it fell into the hands of Thomas II. Yeatman, special agent of the Treasury Department.
3. The cotton appears to have been in bad condition when it reached Memphis, where it was rebaled, and compressed into thirty-five bales, which were afterward sold by Thompson & Go. at public auction, by order of the special agent of the Treasury Department, Yeatman, and the net proceeds, amounting to $6,628.49, paid over to Yeatman, for which he executed his receipt.
4. In the mean time the colored men on the plantation, hearing of this movement of Mrs. Blackburn, followed the cotton to Memphis, and there claimed it as their property, and the special agent of the Treasury, Mr. Yeatman, wrote as follows to the Secretary:
" Cincinnati, January 2, 1868.
“ Dear Sir : Your communication of 22d October last, referring to Mrs. Blackburn’s forty bales of cotton, would have been answered sooner had it not been for the indisposition of Mr. Thompson, the warehouse agent, who had charge of the cotton, and also the desire to get a letter from Mr. Lacy, the agent of Mrs. Blackburn. The cotton of Mrs. Blackburn in question never was formally seized by any agent of the Government, but temporarily detained, more on account of complaint of some negroes who said the cotton had belonged to them, and they were forced to sell the same to Mrs. Blackburn at a price quite below the market value. These facts were made known to General Superintending Agent Mellen, and it was agreed, after a consultation with him by her and her agents, to allow the ne- *291 groes tbe further sum of $2,000. This money was detained out of the proceeds of the cotton, which was directed to be sold by Mrs. Blackburn and agents, and by me paid over by Mr. Mellen’s order to my successor in office, J. M. Tomeny, whose receipt I hold, who in turn was ordered by Mr. Mellen to send the same to Treasury Agent McFarland at GS-oodrich Landing, to be paid to the negroes claiming.
“ I further state that I never sold any cotton regularly taken possession of by me as Treasury agent, unless so authorized by the Secretary of the Treasury or the superintending agent, Mellen, and, as before stated in regard to this particular lot claimed by Mrs. Blackburn, it was only temporarily detained on complaint of the negroes for want of a fair consideration, all the facts being made known to Mr. Mellen. The matter, as before stated, was settled by Mrs. Blackburn agreeing to pay the further sum of $2,000.
“ While this negotiation was going on, Mr. Thompson, who had possession of the cotton, rebaled the same at the instigation of Mrs. Blackburn and agents, Lacey, Able & Oo., reducing the number of packages to thirty-five bales, and gave them full control of it after the above compromise was made, to wit, the cotton was sold by their order through me, the $2,000 retained, and the balance of the proceeds paid over to Mrs. Blackburn and agents, as per receipts filed.
“ Very respectfully, yours,
“ TIÍO. H. YEATMAN,

“ Late Special Agent Treasury Department.

“ Hon. Hugh McCulloch,
“ Secretary United States Treasury.”
5. Out of this sum of $6,628.49, $2,000, less $184, paid to one Munson, and $100 to Creed Bland, was, on the 24th of May, 1864, paid under the' direction of W. P. Mellen, superintendent special Treasury agent, to nineteen colored men belonging to the claimant’s Highland Place, and their joint receipt taken therefor.
The remaining $4,628.49 were paid by Yeatman to Mrs. Blackburn’s attorneys, who executed the following receipt:
“ Received of Thomas H. Yeatman, assistant special agent of the Treasury Department, Memphis, February 10,1864, the sum of $4,628.49, in full of all demands of forty bales of cotton pur *292 chased by Mrs. 0. A. Blackburn from the negroes outhe Spencer plantation near Lake Providence, La. Said cotton was shipped by her order to Lacey, Able So Co., and seized by the Government official at Memphis, and the above is in full of compromise, the negroes being allowed fifty dollars per bale.
«POSTEE, GREGOR & CO.,
“ Attorneys for Mrs. 0. A. Blackburn.”
The facts of this case, which are drawn out with some particularity, forcibly illustrate the loose and reckless manner in which the Treasury agents and others charged with the duty of collecting “’abandoned or captured, property” executed the laws of the United States under which they claimed to act. Their conduct was not only often rude, but in many cases without authority of law, and the injuries thus done to private rights wholly irreparable. The law authorizing the capture of private property on land was of itself severe enough, but it lost much of the dignity of law, and more of its justice and beneficence, in the hands of irresponsible officers and agents intrusted with its administration.
In the case now before us it is plain that the claimant’s title to the cotton claimed in the petition was never divested, and that the Treasury agent at Memphis either knew this fact, or had the means of knowing it fully before him. But he chose to disregard it and to deal with it as belonging to Mrs. Blackburn and the colored men on the plantation where it was produced, neither of whom, as it appears in this record, ever had the shadow of right to a single bale of it.
But the wrong and injury to the claimant did not stop with the special Treasury agent at Memphis. After he had ordered its sale, and received and receipted for its proceeds in his official capacity, and was therefore bound by law to pay them into the Treasury of the United States, the' general supervising agent, Mellen, assumed to direct the application of the proceeds of the sale contrary to law, and through Yeatman, with Mellon’s sanction, every dollar of the money except the necessary costs and charges ivas paid, on a sham compromise, to those who had no legal interest whatever in the fund.
The Treasury as well as the lawful owner of the property were thus defrauded of the proceeds of its sale. And now this suit is instituted to hold the United States responsible for *293 the fund. Can it be done ? Ordinarily the rule of law is, that in cases of public agents the Government or other public authority is not bound unless it manifestly appears that the agent is acting within the scope of his authority, or he is held out as having authority to do the act, or is employed in his capacity as a public agent to make the declaration or representation for the Government.
“ This rule seems indispensable,” says Judge Story, “ in order to guard the public against losses and injuries arising from the fraud or mistake, or rashness and indiscretion of their agents. And there is no hardship in requiring from private persons dealing with public officers the duty of inquiry as to their real or apparent power and authority to bind the Government.”— (Story on Agency, § 307 a; also Bennett, Van Pelt & Co.’s Case, 6 C. Cls. R., p. 103.)
The agents of the Treasury appointed under the act of March 12,1803, are declared by the act itself to be special agents, and they are clothed with specific powers only. They have no general povmrs. The law imposes on such agents the special duty of receiving and collecting all abandoned or captured property, and of appropriating it to public use on due appraisement and certificate thereof, or to forward it to a place of sale within the loyal States as the public interest may require, and there sell it at auction to the highest bidder, and pay the proceeds thereof into the Treasury of the United States.
The statute is the warrant of the power of such agents, and they transcended its scope whenever they assumed to surrender abandoned or captured property which had come into their hands, or to distribute its proceeds after sale to those claiming them. Their plain duty under the law was to pay such proceeds into the Treasury, where they would have safely remained until the claimant could have asserted his right thereto through the instrumentality of this court. The law provided no other means than the “Court of Claims” by which any part of the money derived from the sale of captured and abandoned property could be reclaimed, and through it only after a judicial determination of the claimant’s title to the property when seized, and his right to the proceeds of the sale thereof in the Treasury.
But these plain duties have not been discharged in this case; and whether or not the Treasury agents implicated m *294 this fraud are not responsible on their bonds, is a question with which we have nothing to do. It is certain the Government of the United States is not answerable to the claimant for the proceeds of his property which never reached the Treasury,, unless we overrule the established doctrine that governments or other public authorities are not responsible for the losses or injuries arising from the fraud, or mistake, or rashness and indiscretion of their agents. This we have no power or disposition to do, for the Supreme Court, in the case of Lee v. Munroe, (7 Cranch R., p. 366,) have recognized this principle as the doctrine of the United States.
In holding the claimant not entitled to recover on the facts of this case we do not intend to trench upon the decisions of this court heretofore made, in which we have recognized the claimant’s right to recover after he had lost possession and control of his property through the seizure of the defendant’s officers or agents, charged by law with the duty of collecting abandoned and captured property, but could not trace the proceeds of the sale of such property specifically into the Treasury. The law in such cases, as we held in Silvey’s Case, (4 C. Cls. R., p. 490,) and Henry’s Case, (6 C. Cls. R., p. 389,) presumes that the officers and agents of the Government charged by law with the care and custody of such property discharged their whole duty, and that the property was sold and proceeds regularly paid into the Treasury.
But this doctrine rests on a legal presumption, which like all other presumptions may be rebutted; and here it is rebutted, and directly shown that the proceeds of the claimant’s cotton never reached the Treasury. His right of action, therefore, never accrued under the “Abandoned and captured property Aet.” This right is contingent upon the proceeds of the sale of such property reaching the Treasury, and can only be enforced against the United States after such proceeds have either actually or constructively been paid into the Treasury. — Anderson’s Case, (7 C. Cls. R., p. 121.) The petition is dismissed.