Milligan, J.,
delivered the opinion of the court:
On the facts of this case, which are briefly stated in the opinion, the claimants .seek, first, $47,038 80, less $2,280 30, which have been paid them for extra work and materials furnished on the building; and, second, $46,493 73 for damages produced by the delays and interruptions in the fulfilment of their contract with the defendants.
1. In respect to the facts which are applicable to the first demand, the United States Assistant Attorney General, after a most careful examination of the whole testimony, in his printed brief, very justly remarks that “ it is not his purpose to discuss the evidence which it is alleged establishes the several items of the claimants’ demand. The evidence adduced for that purpose may be regarded as sufficient to establish the claimants’ right to recover, if the government is liable to pay, the several amounts the claimants allege they are entitled to recover.”
Assuming that the admission of the Assistant Attorney General is justified by the facts proven in the record, which we do not doubt, the question, so far as the first branch of this inquiry is concerned, turns wholly upon the law of the case. The contract obliged the claimants to supply the materials and complete the building according to certain plans and specifications thereunto annexed. And General Grosman, by whom the contract was signed, and the supervising architect, by the contract itself, were constituted the agents of the United States to superintend the erection of the building, with full and equal power to reject any materials or workmanship Avhich, in their opinion, or the opinion of either of them, were not of the best quality. Neither of them had in this respect superior power to the other, as was erroneously supposed by General Ekin, in his final decision of this case in the Quartermaster’s Department. The contract limited the powers of each, and neither could go beyond its fair and reasonable interpretation.
The materials were to be of the best quality, and all the work performed necessary to render the building perfect and *81 complete in every respect, according to tbe plans and specifications annexed, whether expressed in the same or not, and no extra charge for modifications allowed, unless such modifications were agreed on in writing, and no change or modification mutually agreed on by the parties was to affect the validity of the original contract.
It is obvious from this language that the parties provided in their agreement for changes and modifications in the work; but it is equally clear that these changes could not be made, according to the contract, unless they were first mutually agreed on by the contracting parties, and that agreement reduced to writing. Every modification, by the terms of the agreement, contemplated a new contract, which in no way was to affect the validity of the old one.
Thus the case stood under the original agreement. But it is argued that that part of the agreement which relates to changes or modifications in the original contract was waived or modified by parol, and that the general principles of the public law authorize the plaintiffs to recover for the extra labor and materials bestowed on the building.
The strictness which in former times prevailed in relation to a claim for extra labor has in more modern times been somewhat relaxed; and the rule in this respect, as laid down by Professor Parsons, is as follows: “ The party cannot recover for extra work, or even for better materials used, if he had not the authority of the other party therefor. But the authority will be implied if the employing party saw or knew of the work or materials in time to object and stop the work without injury to himself, and not under circumstances to justify his belief that no change was intended, and did not object, but received and held the benefit of the same; and if he received from the employed an estimate of the cost of such eajirawork, and then ordered it, the party employed might be bound by such estimate. And if the changes were such that the employer need not infer that they involved any other additional expense, and he was not so informed, an express assent to them does not imply a promise to pay for them, because it is fair to suppose that he believed they were done under the contract, and assented to only on those terms. If the. changes necessarily imply an increased price, and he expressly authorizes, or silently, hut with full knowledge, assents to them, he is then hound to pay for them.” *82 (1 Parsons on Contracts, 541; see, also, Munford v. Brown, 6 Cowen, 476; Dubois v. Delaware and Hudson Canal Company, 4 Wend., 291.)
Tbe facts of this case bring it within the principles of law just laid down, and they would necessarily carry the judgment of this court in favor of the claimants, were there no other intervening obstacles. For it cannot be denied, on the proof in this record, that the changes made in the original plans and specifications necessarily involved, in many instances, an increase, both of labor and cost of materials, which was known to General Crosmau, the government agent. He stood by and daily, witnessed their completion without objections,-and if not in terms assenting to them, impliedly authorizing their completion. And when the work was substantially stopped on the whole .building, by his authority, the contractors refused to proceed, except on the authority of General Pucker’s letter, which, by them and the architect, not to say General Gros-man, was regarded as a waiver of the requirement in the contract, that “ no extra charge for modifications will be allowed, unless such modifications are agreed upon in writing,” and that the cost of all such changes and modifications should, when the building was completed, be settled by a board of arbitrators.
These facts, with many others in which the record abounds, leave no doubt that the alterations made after the 28th of September, 1867, were made under the supposed authority of the Pucker letter, and che new and additional parol agreement of the parties entered into at the time, and distinctly proven by Mr. Fraser, the architect, Allen A. and Jackson Grant, and others.
Assuming, therefore, that the claim for extra work and material, which is the foundation of this action, rests on a parol agreement, the first question which presents itself is whether the Secretary of War, in person, or through those acting under him, had lawful authority to make such a contract. If the authority exists, we are bound to enforce the contract; but if it be wanting, it is equally clear we cannot enforce it as a contract against the defendants, who never authorized it. The government, abstractly considered, is a legal entity, and can neither speak nor act except through its official seal and its lawful officers and agents, who, in every instance, act under *83 tbe authority and restraints of law; and when any such officer or agent, whether he stand at the head of an executive department or act as the agent of such head, assumes to contract with a third person, such person must look to the statute under which his contract is made, and see for himself that his contract conies within the terms of the law, otherwise he takes the consequences of his own folly. (T he Floyd Acceptance cases, 7 Wallace’s R., 666-680; Curtis’s Case, 2 C. Cls. R., 144-152; Henderson’s Case, 4 C. Cls. R., p. 75.)
The act of Congress approved March 2, 1861, (12 Stat. L., 220,) and the act of June 2, 1862, (12 Stat. L., 411,) are applicable to the class of cases of which the one under consideration falls. The first section of the act of June 2, 1862, declares “ that it shall be the duty of the Secretary of War, of the Secretary of the Navy, and. of the Secretary of the Interior, immediately after the passage of this act, to cause and require every contract made by them severally, or by their officers under them appointed to make .such contract, to be reduced to writing, and signed by the contracting parties, with their names at the end thereof, a copy of which shall be filed by the officer making and signing said contract in the ‘return office’ of the Department of the Interior as soon after the contract is made as possible, and within thirty days, together with all bids, offers,” &c. * * * * * *
The tenth section of the act of March 2, 1861 — which is a substantial copy of the sixth section of the act of March 1, 1820 — after prescribing the different modes in which all contracts shall be made, declares that K no contract or purchase shall hereafter be made, unless the same he authorized hy lato, or tinder an appropriation adequate to its fulfillment, except in the War and Navy Departments, for clothing, subsistence, forage, fuel, quarters, or transportation, which, however, shall not exceed the necessities of the current year.”
It is obvious, from the act of June 2,1862, aud the establishment under that statute of the “ return office,” that Congress intended to limit the power of the Secretaries of War, Navy, and Interior, as well as all officers or agents acting under1 their authority in matters of contract, to written agreements signed by the contracting parties. It is true the act does not in terms declare parol contracts invalid; but when this statute is construed in connection with the act of March 2, 1861, which *84 provides for the exigencies under which parol contracts and purchases may be made, there can be no doubt that such contracts are prohibited, and we are therefore denied the right of enforcing them, as contracts in this court. And it can make no difference in this respect whether the original contract rests in parol, or the subsequent or collateral agreement is verbal. If the contract sued on falls within the prohibitions of the acts of Congress referred to, this court has no power, without further legislation on the subject, to enforce it.
But in this ease the record demonstrates, beyond all question, that extra work was performed, and extra materials furnished, which largely increased the labor of construction and the value of the building beyond the original contract price, 'and which the United States have accepted and appropriated without just compensation.
Under this state of facts, and dealing with this case as a transaction between individuals, there can be no doubt 'that the claimants could recover the quantum meruit. But to this ground the tenth section of the act of March 2, 1861, already quoted, is interposed, which prohibits all contracts or purchases, unless the same be authorized by law, or under an appropriation, adequate to its fulfilment. The second section of the act of July 13, 1806, (14 Stat. L., 90,) under which the contract in question was made, is in the following words: “ That the sum of $Í46,000 be, and the same is hereby, appropriated to be disbursed by the Secretary of War in the erection of a fire-proof building in the State of Pennsylvania, to be used as a storehouse for government property at that post.”
It is clear that this act, without the appropriation, contains no words authorizing a contract for the building; but the amount appropriated was considered adequate to the completion of the building desired, and therefore the authority of the Secretary charged with its disbursement to contract for the work designated in the law. The contract was strictly lawful to the extent of the appropriation, but no further. But the cost of the building, under the authority of the government agents intrusted with its erection, was carried beyond the appropriation, and under their orders completed, and subsequently it has been accepted by the United States, and now is in their use and occupation. In this state of the case, are the defendants answerable for the fair and reasonable value of the *85 extra work and materials put upon it? Were tlie question one of original authority in the Secretary or liis agents to contract for a building which would cost more than the appropriation, we should unhesitatingly hold with the cases cited from the Opinions of the Attorneys General, (4 yoL, GOO; 9 vol., 19,) that he had no power to contract for more work than he could control money to pay for. But such is not this case. Here the extra work has been done and materials furnished under the supposed authority of the chosen agents of the government, when the contractors were ready and willing to complete the building in strict accordance with their original agreement. The building is made more valuable, permanent, and useful, by the extra work and materials bestowed upon it, than it would have been had it been completed according to the terms and specifications of the written contract; and we think, upon the plainest principles of natural justice and common equity, the United States are bound to pay the fair and reasonable value of the extra work and materials.
We are aware that this is a delicate doctrine when applied to the United States, which only act through their agents, whose authority is limited by law; but under the broad provisions of the act of February 24, 1855, organizing this court, we have jurisdiction over all “claims founded on contracts, either express or implied,” and'a stronger case of implied contract can scarcely be presented.
To hold otherwise, under the circumstances of this case, would be to hold that the United States, through their accredited agents intrusted with the supervision of the execution of their contracts, could at their own option put it out of the power of the contractors to fulfill their agreements with the government, by compelling them to depart from the original stipulations in the written agreements, and to perform other and additional labor, which they were not bound under contract to perform, and then escape payment by pleading nonperformance. Such a doctrine is abhorrent, and opposed to all the well-settled principles of justice and equity, and cannot be recognized by any court of justice.
Besides, this general doctrine here enforced has been recognized by this court in the case of Fowler v. The United States, (3 C. Cls. R., 43.) This case, although not in all respects like the one under consideration, bears a strong analogy to it, and *86 in it a contract which exceeded, the appropriation was upheld, and judgment given in damages for its breach. And in no instance, to my knowledge, have we declined to give judgment for the claimant, when on grounds of quantum meruit he has shown himself clearly entitled to recover. Any other doctrine would be dishonoring to the government, and often embarrassing to the executive departments intrusted with the execution of contracts made under appropriations, which, with all the precaution the departments could exercise in letting them, sometimes prove slightly inadequate to their fulfillment.
2. The second ground of complaint, which is a claim for damages growing out of the misconduct of General Grosman’s subalterns, is readily disposed of. It was the claimant’s own folly to obey the orders of those he was not bound to obey, or to suffer delays and losses through the officious intermeddling of parties unknown to the contract. (See Gibbon’s Case, 2 C. Cls. R., 420.)
It is true, it is admitted by the Assistant Attorney General that the conduct of Oaptaiu Craig, which General Grosman seems to have indorsed in some instances, was both “ unjustifiable and unauthorized,” but we cannot hold the United States responsible in damages, even for the acts of their own agents, much less of third parties, when the government took no benefit from them; “for the government does not undertake to guarantee to any person the fidelity of any of its officers or agents whom it employs, since that would involve them in all their operations in endless embarrassment and difficulties, and. losses which would be subversive of the public interest.” (Story on Agency, section 319.)
On the whole case, we reject the claim for damages altogether ; and award judgment for the extra work actually done, and materials furnished, which, according to the estimate of Mr. Fraser, the defendant’s own architect, we find, after rejecting all items that may be legitimately referred to the contract, to amount to the sum of $34,225 14, for which judgment will be entered.