Weldon, J.,
delivered tbe opinion of tbe court:
Tbe plaintiff on tbe 15th of December, 1881, filed a petition in which be claimed tbe sum of $10,000 as compensation for work performed by him in dredging tbe Delaware River, under a contract dated on tbe 28th day of January, 1880; alleging, that because of tbe work being different from tbe specifications, and tbe assurance of tbe engineer in charge of the work *338 that be would be paid for the increased value of the labor, that claimant is entitled to. recover said sum from the defendants.
On the 22d day of January, 1886, he filed an amended petition, in which he alleges, that as the contract into which he-entered as aforesaid provided for the excavation of 180,000 cubic yards, more or less, of material, he made arrangements tO' perform that amount of work, and he further avers—
’ “ That there being no convenient land above high-water mark upon which-the said material could be landed, and the defendant failing to provide a dike or bulkhead behind which the said material could be deposited, your petitioner was required by the officers of the defendant in charge of said work to construct a dike for that purpose; and that in obedience to the requirements of said officers, and upon the supposition that he would be required to excavate, remove, and deposit the amount of material specified in said contract, to' wit, 180,000 cubic yards, he purchased the necessary land, and constructed a dike capable of holding 180,000 cubic yards of said material, at a cost to himself of the sum of eight thousand dollars. And your petitioner further avers that by reason of the said premises he is entitled to have and recover from the said defendant the sum of eight thousand dollars in addition to said sum of $10,000.”
The original and amended petitions make two distinct claims for compensation, first the increased cost because of the difference in the character of the material in fact, and the character as set forth in the specifications; second, compensation for the damages or costs incident to the construction of a dike and the purchase of land to be used as a dumping ground for the débris of the excavation.
Upon the first branch of the case, the facts set forth in the. eighth finding are applicable—
“ Relying upon the promises of the engineer in charge, to' whom the matter had been referred by Col. Macomb, that he should be compensated for the difference in the character of the work, the'claimant continued the prosecution of the same up to the 19th day of July, 1880, when he was notified verbally of the suspension of the work. He had then excavated and removed from the channel of the Delaware River, near Petty’s Island, 33,232 cubic yards of said material, for which he was-paid by the United States, the sum of thirty-five cents per cubic yard, as provided by said written contract, making the sum of $11,631.20; and .after the suspension of the work when claimant called on Col. Macomb for a settlement in full he was *339 referred by tbat officer to Gen. Wrigbt, and Gen. Wright's answer to the demand was ‘I can do nothing for you.’ ‘ Your only recourse is an act of Congress or the Court of Claims.’”
By this finding it will be seen that the claimant removed 33,232 cubic yards of excavation for which he has been paid at the rate of 35 cents, the contract price; and finding xn shows, that the reasonable value of the removal of the material as it. in fact existed was the sum of 55 cents. The difference-between the value of the removal of the hind of material that, was removed, and the contract price is the sum of $6,646.40;: and if the contention of the complainant be sound in law, upon that branch of the case, he is entitled to recover the sum of' $6,646.40. Whatever of obligation as a contract expressed which rests on the United States grows out of, and is dependent upon, what was said between the engineer in charge of the.* work and the claimant at the time it was discovered, that the-material in the excavation differed very essentially from the-specifications of the agreement. If the engineer in charge had authority to bind the defendants by his assurance that additional compensation would be paid, such assurance makes the defendants responsible, and upon that part of the case claimant has a right to recover.
The contract under which the work was performed provides :
“If, at any time during the prosecution of the work, it be-found advantageous or necessary to make any change or modification in the project, and this change or modification should involve such change in the specifications as to character and quantity, whether of labor or material, as would either increase- or diminish the cost of the work, then such change or modification must be agreed upon in writing by the contracting parties, the agreement setting forth fully the reasons for such change, and giving clearly the quantities and prices of both material and labor thus substituted for those named in the original contract, and before taking effect must be approved by the-Secretary of War: Provided, That no payments shall be made-unless such supplemental or modified agreement was signed and approved before the obligation arising from such modification was incurred.
“ hfo claim whatever shall at any time be made upon the United States by the party or parties of the second part for or on account of any extra work or material performed or finished, or alleged to have been performed or furnished, under or by virtue of this contract, and not expressly bargained for and specifically included therein, unless such extra work or- *340 materials shall have been expressly required in writing by the party of the first part or his successor, the prices and quantities thereof having been first agreed upon by the contracting-parties and approved by the Chief of Engineers.
“Payments shall be made to the said G. H. Ferris when the work contracted for shall have been delivered and accepted, reserving ten (10) per. cent from each payment until the whole work shall have been so delivered and accepted.”
The findings do not show that Col. McComb during the progress of the work had any knowledge of the understanding or agreement between the engineer in charge and the claimant as to the increased compensation; nor do they show that either the Secretary of War or the Chief of Engineers consented or agreed in any way that the claimant should be paid beyond the 35 cents provided in the contract. The agreement stipulates that no claim shall be made against the United States “for or on account of extra work or material performed or furnished or alleged to be performed or furnished under or by virtue of said contract. ” This court said in the ease of Ford (17 C. Cls. R., 75);
“In applying the law of agency to the transactions of the Government, it has not been the purpose of the Supreme Court, nor of this, to shackle or curtail the lawful and reasonable powers of the executive. Both courts have sought with great unanimity of decision to uphold the necessary discretion of the heads of the executive departments, and other responsible officers of the Government, but at the same time so to apply the law that subordinate and irresponsible agents should not bring upon the Government an unauthorized indebtedness through the medium of implied contracts.”
The case of Hawkins (12 C. Cls. R., 181) involves a principle similar to the one at issue in this proceeding. In that case it was held by this court, in substance, that a subordinate agent of the United States has no power to bind the Government by changing the terms of an agreement, although the party may have performed labor upon the faith of the change beyond the terms of the original' agreement. The case was taken to the Supreme Court and affirmed substantially upon the doctrine announced by this court. (Hawkins v. United States, 96 U. S. R., 689.)
In the opinion of the Supreme Court it is said:
“ Individuals as well as courts must take notice of the extent of the authority conferred by law upon a person acting in an *341 official capacity; and the rule applies, in such a case, that ignorance of the law furnishes no excuse for any mistake or wrongful act. (State, ex rel., etc., v. Hayes, 52 Mo., 578; Delafield v. The State of Illinois, 26 Wend (N. Y.), 91; The People v. The Phoenix Bank, 24 id., 430; The Mayor and City Council of Baltimore v. Reynolds, 20 Md., 1; Whiteside v. United States, 93 U. S. R., 247.)
“Different rules prevail in respect to the acts and declarations of public agents from those which ordinarily govern in the case of mere private agents. Principals in the latter category are in many cases bound by the acts and declarations of their agents, even where the act or declaration was done or made without any authority, if it appear that the act was done, or the declaration was made by the agent in the course of his regular employment; but the Government or public authority is not bound in such a case, unless it manifestly appears that the agent was acting within the scope of his authority, or that he had been held out as having authority to do the act, or make the declaration, for or on behalf of the public authorities.”
It was also held that, as the contractor was bound to take notice of the fact that the assistant superintendent had no power to vary the contract, he was only entitled-to recover according to its terms.
In discussing the question of the jurisdiction of this court the Supreme Court say:
“Jurisdiction is not conferred upon the Court of Claims to allow mere extra allowances in a case where there is no promise to that effect, either express or implied* Power to hear and determine claims founded upon any law of Congress, or upon any regulation of an executive department, or upon any contract express or implied, with the Government of the United States, and all claims which may be referred to it by either House of Congress, is vested in the Court of Claims.' Mere application for extra allowance, unsupported by any contract express or implied, must be made to Congress, where alone they can properly be entertained.” (Eev. Stat., sec. 1059.)
In the Ford case it is said:
“If the contract in this case had been made by the Chief of Engineers, the extra work ordered by the engineer in charge would have been without authority, and at the risk of the contractors, and the case would be like that of Hawkins (supra). Or if the extra work, instead of havingbeen orderedby theofficer who made the contract, had been ordered by the local assistant engineer who supervised the work, it would have been an order prohibited by the contract, and the case would have been like that of Braden & Angus (16 C. Cls. R., 389). But here Maj. *342 McFarland bad tbe same authority to order tbe extra work tbat be bad to make the original contract. Tbe extra work was ■equally within bis discretion, and it no more required tbe approval of tbe Chief of Engineers than did tbe formal written •contract of which it was a variation. Furthermore, tbe authority and discretion in ordering tbe height of tbe embankment to be increased was questioned neither by bis successor, under whom a large part of tbe work was done, nor by bis superior, tbe Chief of Engineers, who exercised an official and professional supervision of bis proceedings, nor by tbe Secretary of War, who ultimately bad tbe matter of this extra work brought to bis personal notice. This acquiescence on tbe part of high officers of tbe Government, in whom tbe power of ratification undoubtedly was, coupled with tbe facts of acceptance and payment and extension of tbe time wherein tbe claimants might perform it, constitute a ratification of tbe most unequivocal •character.”
In construing a similar provision in a contract in litigation in Dale’s Case (14 C. Cls. R., 533) this court said:
“This alone is sufficient to prevent tbe claimant from recovering any part of tbe first claim under tbe second contract, There was not a particle of evidence tbat tbe prices and quantities of such extra work were agreed upon by tbe contracting parties, or that tbe same were approved by tbe Chief of Engineers. In tbe absence of a finding of such material facts, tbe court can not set aside tbe salutary check of tbe contract upon tbe otherwise unbridled license of local agents. It was the claimant’s duty to see tbat tbe agent who ordered this change bad authority from Washington to do so.”
Tbe provision of tbe agreement under consideration is very important in its character and office. It keeps within tbe power of tbe department, or tbe office making tbe agreement, tbe control of tbe contract and prevents persons in charge of tbe mere execution of tbe work from changing tbe rights and increasing the liability of tbe Government.
Tbe contract in this case was let after and upon extensive advertisement, thus inviting competition among bidders, which is assumed by tbe policy of tbe law to have a salutary effect in preventing extortion against tbe iiublic, and tbe only way in which a contract founded upon that advertisement and policy can be changed is specifically prescribed in tbe agreement.
In tbe case of Kennedy (24 C. Cls. R., 144) it is said:,
“This provision is'one of tbe essential.terms of tbe agreement, and its recognition and enforcement are absolutely *343 necessary to protect tbe rights of the Chief of Engineers by whose approval the instruments were given the force of contracts.”
This branch of the claim is not based upon a violation of the contract, but upon a change made in it by increasing the compensation to be pai¿L the contractor. The defendants have paid all they agreed to pay by the terms of the written agreement.
No implied obligation can arise against the United States because of the performance of the work by the claimant under the assurance of the officer in charge. The responsible parties, having in charge the making of such agreements, and having alone the power to change, are not presumed to be cognizant of the conditions upon which, the work was done. The recognition of an implied obligation to pay what the work was reasonably worth would be a most dangerous implication against the rights of the public in placing them within the power of every agent who is in any way connected with the public service. The law and public policy have entrusted certain officers with responsibilities and powers, and parties dealing with the Government must deal with them, and not with agents having no discretion or right beyond a mere executive duty. The officer in charge simply represented the Government to the extent of superintending the performance of the work, and had no power or discretion beyond the limit of that duty.
It has been held by the Supreme Court and this court that where there has been a delivery of goods under an agreement void in law, because of the want of some formality, there may be a recovery on a quantum meruit; but that principle of law does not apply to a transaction such as is involved in this case. Aside from the question as to whether the statute requiring ■certain contracts to be in writing is directory or mandatory there is involved in this case a far more material and important question; and that is whether the right and power of the Secretary of War and the Chief of Engineers in contracts of this kind can or may be superseded by the acts and agreements of the officer in charge.
. When it was ascertained by the claimant that the material contemplated by the contract was essentially different from the material to be dredged, it was his duty, if he did not wish to pro *344 ceed with the execution of the work, to so notify the officer with whom he had contracted and get from him by the sanction of the proper parties such changes as could be agreed upon. To now hold that the officer in charge of the work had a right by any act done or omitted to be done to change the terms of the agreement, or to so change the rights of the parties from which an implied agreement might arise, is to relegate to the discretion of such officer the powers which, by ,the terms of the contract, are reserved to his superior officers. Such a construction of the law might lead to the most dangerous consequences to the Government by changing its rights from the jurisdiction of officers entrusted with the original making of the contract, and from the certainty of written agreements, to the uncertain terms of oral contracts.
The maxim " delegata potestas non potest delegarV’ rests upon the principle that authority is conferred on considerations personal to the party to whom the power is given, and to permit its delegation would destroy the right inherent in the principal to select according to his choice his own agents.
The officer in charge was a special agent of the United States to superintend ■ in their interest the execution-of the work, and of that limitation the claimant had notice and knowledge.
“ In respect to the acts and declarations and representations of public agents, it would seem .that the same .rule does not prevail, which ordinarily governs in relation to mere private agents. As to the latter (as we have seen), the principals are in many cases bound, where they have not authorized. the declarations and representations to be made. But in the case of public agents, the Government, or other public authority, is not bound, unless it manifestly appears that the agent is acting within the scope of his authority, or he is held out' as having authority to do the act, or is employed, in his capacity as a public agent, to make the declaration or representation for the Government. Indeed, this rule seems indispensable, in order to guard the public against losses and injuries arising from the fraud, or mistake, or rashness or indiscretion of their agents. And there is no hardship in requiring from private persons, dealing with public officers, the duty of inquiry, as to their real or apparent power and authority to bind the Government.” (Sec. 307, Story on Agency, p. 374-5.)
By the law of agency at the common law there is this difference between individuals and the Government; the former are *345 liable to the limit of the power they have apparently given to their agents; while the Government is liable only to the extent of the power it has actually given to its officers. (Pierce v. United States, 1 C. Cls. R., 274.)
In the case of Grant (5 C. Cls. R., 71) it was held by this court that where a party under the direction of the proper officer furnished extra materials and performed extra labor, and thereby the building is rendered more valuable and useful to the United- States, the contractor is entitled to recover, although the cost of the building is in excess of the appropriation; but that case is distinguishable from this, in the fact that the extra materials and labors were furnished by the claim'ant under the direction of the proper authority, and the United States obtained a better building than" the one contracted for. Under the contract in this case, the defendants had the same wprk performed, to wit, dredging, but of different' material than the kind contemplated by the agreement.
There is another clause in the agreement important in the interpretation of its provisions as to the rights of the claimant to recover upon the facts. The original agreement is for the removal of 180,000 cubic yards, more or less, of “sand, mud, and gravel” at 35 cents per cubic yard. The modified agreement on which the plaintiff seeks to recover is for the removal of sand, mud, gravel, and bowlders at 55 cents per cubic yard, changing in a very substantial particular the “project” as contemplated by the terms of the written contract. The contract provides when a change becomes necessary “as would either increase or diminish the cost of the work, then such change must be agreed upon in writing by the contracting parties, the agreement setting forth fully the reason for such change and giving clearly the quantities and prices of both material and labor thus substituted for those named in the original contract, and before taking effect must be approved by the Secretary of "War.” The change in this case was a change of the most material character. It was the substitution of a different material from that contemplated by the agreement, with an increase in the price of over 50 per cent in the cost of the work. It is not pretended that the Secretary of War had any notice of the change in the agreement or that he consented in any way to increase the compensation from 35 cents per cubic *346 yard to a reasonable value, which by the testimony is found to be 55 cents per cubic yard.
To permit a recovery upon the basis of 55 cents, thus substituting the contract made orally by the officer in charge, in violation of all the safeguards of the original contract, we would establish a dangerous principle against the right of the ‘Government and the stability and force of written contracts.
The second claim of the amended petition arises upon the tenth finding, which is as follows:
“The United States having no place above ‘high-water mark’ on which to deposit the material excavated from the channel of the river, the claimant was under the necessity of purchasing land and constructing a dike for the reception of said material; that the claimant purchased about 7 acres of land on the ufiper end of Pettys Island at a cost of $5,000 and built a dike thereon capable of holding from 150,000 to 180,000 cubic yards of said material at a cost of $2,800, and the material excavated by him from said river under said contract was deposited by him behind said dike.”
It is also shown that the engineer in charge agreed that said place was a proper place to deposit the dirt, and that after the suspension of the work the claimant sold said land and dike. for the sum of $7,500.
It is shown by the fifteenth finding that the claimant commenced the work on the 1st of March, 1880, and continued until the 19th of July, 1880, when upon verbal orders from Ool. Ludlow, the local engineer in charge, he ceased farther work under the contract. It does not appear that he objected to the suspension of the work or that he applied to the officers to be reinstated in its prosecution.
By reference to the specifications, which are a part of the contract, it is provided:
“The material raised is to be disposed of by the contractor, subject to existing laws and regulations, which forbid any dumping in the river. It must therefore belauded above high-water mark or deposited behind a suitable dike or bulkhead.”
This specification being a part of the agreement, it was the duty of the claimant to provide himself with suitable dumping ground, either by the purchase or lease of land above high-water mark or by the construction of a proper bulkhead or dike.
*347 That was a part of tbe cost incident to tlie performance of the work for which he was to get 35 cents per yard.
In the trial of the case a claim was' made for the increased value of the 7 acres provided the claimant had been permitted to excavate and deposit the amount of 180,000 yards upon the surface of the land purchased, but the proof offered does not tend to develop a satisfactory basis upon which any finding can be based as to damages of that kind.
The ground upon which the work was suspended was that the funds were exhausted. There, was no money assigned for the improvement of the Delaware River, out of the appropriation for rivers and harbors for the fiscal year 1879-’80, but there were $33,000 allotted to that object from the appropriation for the fiscal year 1878-’89, made January 8,1878.
After the suspension of the work the claimant sold the land and the dike to the New York Steam Dredging Company for the sum of $7,500, which company used it for depositing material from the Delaware River.
The plaintiff by this sale recovered within $300 of the amount of the purchase of the land and cost of constructing the dike. The claim for damages growing out of the alleged loss on the land because claimant was not permitted to perform the contract to the full measure of 180,000 cubic yards can not be sustained on principle. If the Government is at fault in not permitting the claimant to prosecute the work to the full extent of the agreement, the claim for a depreciated value of the land because of such failure is not such a damage as is the legitimate and necessary consequence of the fault of the defendants. The rule which fixes the limit of compensation in cases where positive injury results from the wrong prohibits any allowance for damages remotely resulting from the principal illegal act.
“Such damages are frequently termed remote damages and sometimes consequential damages. These terms are not, however, necessarily synonymous or to be indifferently used; all remote damages are consequential, but all consequential damages are by no means remote.” (Sedgwick on the Measure of Damages, Yol. 1, p. 90.)
The speculation which the plaintiff might have made in the increased value of the land is too remote to be considered in estimating the damages incident to a violation of the contract upon the part of the defendants. '
*348 The law compensates in damages for the necessary and proximate consequence of wrongs, but not for the remote and speculative.
The claim for loss on the land comes within the character of the alleged damages in the case of Tillson (11 C. Cls. R., 758), decided by this court and affirmed by the Supreme Court on the ground that the damages were too remote for judicial relief.
While we hold that the claimant is not entitled to recover for an enhanced value of the land, a majority of the court are of the opinion that claimant, not having been furnished with the kind of work contemplated by the agreement, not being permitted to recover on the basis of the understanding with the officer in charge, having upon the faith of the due performance of the agreement made an investment of $7,800 for the completion of the work, and having sold that investment for $300 less than its cost, he is entitled to recover the sum of $300, and for that amount a judgment will be entered.