Terry C. **BRUNNER,** Plaintiff,

v.

The **UNITED STATES,** Defendant.

No. 98–554C.

United States Court of Federal Claims.

May 2, 2006.

Gale R. Gustafson, Gustafson & Rohrer, Conrad, Montana, for the plaintiff.

Steven M. Mager, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Mark L. Josephs, Senior Trial Counsel, all of Washington, D.C., for the defendant. Richard A. Medema, Office of Chief Counsel, Drug Enforcement Administration, Arlington, Virginia, of counsel.

### OPINION AND ORDER

WOLSKI, Judge.

Plaintiff Terry C. Brunner seeks damages arising from an alleged breach of an oral contract with the United States Drug Enforcement Administration ("DEA"), to compensate him for assistance he rendered against drug traffickers. Defendant has moved for summary judgment, arguing that none of the DEA agents involved had the authority to bind the government in a contract. Plaintiff has cross-moved for summary judgment, contending that such authority was possessed by individuals who either made, approved, or ratified the agreement,

and that the fact that there was an agreement is not properly disputed. For the reasons explained below, the Court GRANTS-IN-PART and DENIES-IN-PART the defendant's motion for summary judgment, and GRANTS-IN-PART and DENIES-IN-PART the plaintiff's cross-motion for partial summary judgment.

### I. BACKGROUND

The plaintiff served as a cooperating individual for the DEA from August, 1992, until January, 1993. *See* Def.'s Resp. to Pl.'s Prop. Findings ¶ 14. According to the plaintiff, the DEA asked him to infiltrate the Great Falls, Montana biker community, operating out of "Cossack's Motorcycle Club." *See* App. to Def.'s Mot. Summ. J. ("Def.'s App.") at 20 (Brunner depo. tr. pp. 34–35). Before agreeing to assist the DEA, the plaintiff met with DEA field agents Wes Hearon and Gale Williams, as well as Resident–Agent–in–Charge ("RAC") Ben Yarbrough, in the Great Falls DEA office. *Id.* at 20–21 (Brunner depo. tr. pp. 35–39); *see also* Def.'s Resp. to Pl.'s Prop. Findings ¶ 4. The plaintiff was officially activated as a cooperating individual on August 3, 1992, signing a DEA "Cooperating Individual Agreement" form—which agents Hearon and Williams also signed. *See* Def.'s App. at 1; *see also* Def.'s Prop. Findings ¶¶ 1–3. The assistance and information that Mr. Brunner provided to the DEA "resulted in six individuals pleading guilty and one individual being found guilty at trial." Def.'s Answer ¶ 9; *see also* Def.'s Resp. to Pl.'s Prop. Findings ¶ 24.

In exchange for his assistance, the plaintiff alleges that he was orally promised compensation consisting of: (1) a salary of $2,000 per month plus expenses; (2) an award of $2,500 per defendant indicted based on his cooperation; (3) an award of twenty-five percent of any assets seized as a result of his work; and (4) relocation expenses for his family. *See* Def.'s App. at 21, 22 (Brunner depo. tr. pp. 37–38, 41); Compl. ¶¶ 8, 12. The plaintiff was paid pursuant to seventeen payment vouchers approved on dates ranging from August 10, 1992, through November 23, 1992. *See* App. to Pl.'s Cross–Mot. Summ. J. ("Pl.'s App.") at 20–36. He was deactivated

for unsatisfactory performance on January 6, 1993.[1] Def.'s App. at 10. At the time of the plaintiff's termination, the DEA had paid him over $13,000 for compensation and expenses. *Id.* (indicating that payments of $10,729.95, plus $3,000 for the purchase of evidence, had been made); *see also id.* at 4; Pl.'s Resp. to Def.'s Prop. Findings ¶ 6. But the plaintiff contends that this is far less than he was promised.

The plaintiff claims that he received less than two months' salary despite five months of service;[2] never received moving expenses for his family; never received award payments for defendants indicted, convicted or pleading guilty; and never received the twenty-five percent share of forfeited assets—a total amount asserted to be $67,527.71. *See* Compl. ¶ 12. The government contends that, as a matter of law, the plaintiff may not enforce his various agreements—if any existed—because no one who dealt with him was authorized to contract on behalf of the DEA, and anyone purporting to do so was without authority. *See* Def.'s Mot. Summ. J. at 6–10.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Rules of the United States Court of Federal Claims ("RCFC"); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court interprets the facts and inferences therefrom "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). An outcome-determinative fact is a material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A dispute over facts is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* To demonstrate a genuine dispute over a material fact, the nonmoving party need not "produce evidence in a form that would be admissible at trial." *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. The moving party, however, must file with the Court the documentary evidence, such as exhibits, that support its assertions that material facts are beyond genuine dispute, *see* RCFC 56(h), unless it is basing its motion for summary judgment on the "absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548; *see also Anchor Sav. Bank, FSB v. United States,* 59 Fed.Cl. 126, 140 (2003).

### A. The Motions for Summary Judgment

■ The motions before the Court concern the existence and validity of an alleged oral contract between Mr. Brunner and the DEA. Whether the contract is express or implied-in-fact, the elements are the same. *Trauma Service Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997). "The party alleging a contract must show a mutual intent to contract including an offer, an acceptance, and consideration." *Id.* (citing *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990)); *see also Perri v. United States,* 53 Fed.Cl. 381, 394 (2002). The difference between an express and an implied-in-fact contract is that the "lack of ambiguity in offer and acceptance," *City of El Centro,*

---

1. The defendant states that the deactivation occurred December 30, 1992, Def.'s Mot. Summ. J. at 3. It was not approved, however, until January 6, 1993, Def.'s App. at 10; Pl.'s Cross–Mot. Summ. J. at 8–9.

2. There appears to be some tension between the Complaint and the plaintiff's cross-motion for summary judgment concerning what the plaintiff claims is owed him in salary. In the Complaint he contends that he is due $4,000 in salary for the months of August and November. Compl. ¶ 12. But in his summary judgment brief he argues that he is due $6,200 in salary, counting August, November, December and part of September. *See* Pl.'s Cross–Mot. Summ. J. at 8. The defendant has not highlighted this discrepancy. Given its position that no contract may exist between the parties, and given that the Complaint seeks "damages in the amount of no less than" $67,527.71, Compl. at 8, the Court concludes that the defendant would not be prejudiced by permitting the plaintiff to assert a claim for $6,200 in salary due.

627

922 F.2d at 820, or "meeting of the minds … is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R.R. Co. v. United States,* 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923); *see also Trauma Service,* 104 F.3d at 1326.

■ When the United States is a contractual party, an additional requirement is that the government representative whose conduct is relied upon must have "actual authority" to bind the government in contract. *See, e.g., Trauma Service,* 104 F.3d at 1325; *City of El Centro,* 922 F.2d at 820; *Tracy v. United States,* 55 Fed.Cl. 679, 682 (2003); *Humlen v. United States,* 49 Fed.Cl. 497, 503 (2001); *Toranzo–Claure v. United States,* 48 Fed.Cl. 581, 583 (2001). "Therefore, even if a government employee purports to have authority to bind the government, the government will not be bound unless the employee actually has that authority." *Tracy,* 55 Fed. Cl. at 682 (citing *Humlen,* 49 Fed.Cl. at 503). The government bases its argument almost exclusively on this last point, contending that none of the DEA officials upon whom plaintiff allegedly relied had actual authority to bind the agency in contract. Hence, it contends there can be no enforceable agreement as a matter of law. Def.'s Mot. Summ. J. at 6. The plaintiff argues that the officials with whom he dealt directly had the authority to bind the government; and that, even if these agents lacked the requisite authority, their actions were later ratified by persons with authority. *See* Pl.'s Cross–Mot. Summ. J. at 10, 13–14. The issue of contracting authority is thus critical to resolving the motions before the Court.

**B. The Authority to Contract on the Government's Behalf**

Since the defendant is an entity, and not a natural person, it must act through officers and agents. The Constitution specifies the process by which some of these individuals are authorized—the President and Vice–President are selected by electors appointed by each state, or failing that, by the state delegations in the House of Representatives, U.S. CONST. art. II, § 1; *id.*

amend. XII; members of Congress are elected by voters in each state, *id.* art. I, § 2; *id.* amend. XVII; and other officers are either appointed by the President after Senate confirmation, appointed by the President while Congress is in recess, or appointed by the President, federal courts, or executive department heads, pursuant to an act of Congress. *Id.* art. II, § 2. By their nature, the officers and agents of an entity exercise powers delegated to them by the entity, and this is no less true when the entity is a government possessing powers, in turn, granted it by the people.

■ It is long, although perhaps not well, settled that the principles of agency apply somewhat differently when the principal is a government, rather than a private, entity. In particular, it is often said that a government agent must have actual or implied authority in order to bind the government in a contract, as opposed to the apparent authority that enables agents to bind other entities. *See, e.g., H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989) (stating "apparent authority will not suffice to hold the government bound by the acts of its agents") *(citing Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947)). But the meaning of this rule, its reason for being, and its practical consequences are all far from clear.

*1. Background Principles of Agency*

In order to fully appreciate the different way that agency principles have been applied in the context of government agents, one must first take stock of these principles as they are normally applied. The creation of an agent's authority is a matter between the principal and his agent. *See* RESTATEMENT (SECOND) OF AGENCY § 7 (1958). The principal, naturally possessing the power to act for himself, enlists the activity of an agent by communicating to the latter the power he is granting. When the principal is an individual, the matter of authorizing an agent is fairly straight-forward. When the principal is an entity, however, an additional wrinkle is added—the delegation of authority is subject to constitutional rules, embodied in acts or articles of incorporation, corporate charters

and the like, as well as processes that are duly-adopted, in such forms as by-laws or board rules. Federal government entities are made up of many levels or layers of delegated authority: the people first acted by adopting the Constitution and continue to act through the electoral process it mandates; the three branches operate under the powers conferred via the Constitution, and the authority granted through enacted legislation; Executive branch employees work subject to formal regulations and informal policies, and with the powers delegated, in turn, from department heads on down.

When considering entities, then, a complication arises due to the fact that the delegation of authority is often made by someone who is himself the agent of the ultimate principal—or the sub-agent of an agent, and so on. The person (or process) delegating authority may require certain formalities or conditions to be followed in exercising that authority, but the power to impose the conditions includes the power to waive them. *See, e.g., Ford v. United States,* 17 Ct.Cl. 60, 77–78, 1800 WL 983 (1881). But aside from the problem of identifying how the power is wielded at the principal level, there would naturally be no difference between the creation of an agency relation by an individual and its creation by an entity. In neither instance is there an inherent requirement that the delegation of power be achieved through any particular formality, such as a writing. *See* RESTATEMENT (SECOND) OF AGENCY § 7 cmt. b (1958) (explaining manifestation of consent in authorizing an agent).

This lack of required formalities may lead to misimpressions concerning the concept of apparent authority. Authority is not apparent merely because it was not expressly conferred, through a writing or some specific instructions. The lack of such specificity in the communications between a principal and an agent may result in what is known as *implied* authority which, under the law of agency, is considered to be *actual* authority just the same as an express conferral of power. *See id.* § 7 cmt. c (explaining that "most authority is created by implication" and distinguishing this from apparent authority). Apparent authority, on the other hand, means the authority that a principal makes third parties believe he has conferred on an agent. *Id.* § 8 cmt. a. When this does not differ from the amount of authority the principal makes his agent believe was conferred, then apparent and actual authority coincide. *Id.* The principal might create the appearance of an agent's authority to contract by making statements directly to third parties or generally to the public, by authorizing the agent to communicate the scope of delegated power, or by employing the agent in a manner to create the appearance (known as "holding out" the agent). *See id.* § 8 cmt. b; § 27 cmt. a; § 49 cmts. b, c; § 159 cmt. b. Apparent authority typically comes into play when the principal secretly limits or conditions an agent's power—for example, by commanding the agent not to promise to pay more than a certain amount. *See, e.g., id.* § 8 cmt. a, illus. 2; § 49 cmt. b, illus. 2, 3. The difference between apparent and actual authority results from the third party's lack of knowledge of the secret instructions given to the agent.

### 2. The Different Rule Concerning Government Agents

Apparent authority commonly arises, then, when an agent disobeys the secret orders of his principal. It would alarm more than a few people, though, if the different application of agency principles to the government meant that a government contractor is out of luck whenever a contracting officer it dealt with violated some secret instruction. Fortunately for the reputation of the government, this is not what the different rule for the government means. Instead, it concerns whether a third party is on notice of, or has a duty to inquire about, limitations on an agent's authority.

Normally, when a principal is responsible for the appearance of an agent's authority, a third party aware of this appearance may rely on it. This is even the case when an agent's statements have helped create the impression of authority, if either the agent were authorized to represent its authority, or the principal acquiesces in the statements. *See id.* § 8 cmt. b & illus. 6. Two exceptions are when "circumstances indicate that the

agent may be acting in fraud of the principal," *id.* § 166 cmt. c, and when the third party "has notice that the agent's authority is created or described in a writing which is intended for his inspection...." *Id.* § 167. When these exceptions apply, the third party has the duty to use reasonable means to investigate the scope of the agent's authority. But the rest of the time, when a principal creates an appearance of an agent's authority expressly, or by holding out the agent (that is, by implication), no duty of inquiry falls on third parties to verify this authority.

When dealing with an agent of the government, however, third parties have a duty to inquire into whether restrictions have been placed on that agent's authority. This duty does not require that a potential contractor identify the agent's supervisor and contact that person, but rather that publicly-available laws and regulations are consulted—presumably because public entities act publicly. In other words, this duty is just the complement of the notice of laws and regulations that is assumed for all citizens, and is merely a general rule for transactions with the government that mirrors a special rule that applies when any transactions are subject to law or regulation. *Cf. id.* § 166 (stating a principal is not liable when third party has notice of limits to an agent's authority); § 27 (stating there is no apparent authority created in case of "transactions required by statute to be authorized in a particular way"); *but see id.* § 167 cmt. b (explaining that for purposes of notice, corporate by-laws and business records are ordinarily *not* considered to be intended for inspection).

These various threads of agency law seem to come together as follows: 1) Authority can be created either expressly or by implication; 2) public entities act publicly, using the same means to communicate the grant of authority to their agents that they use to communicate this to third parties; 3) apparent authority describes the situation when a principal has placed restrictions on an agent that are not known to a third party; 4) restrictions on government agents are accomplished in the open, through laws and regulations; 5) everyone, including contractors, are supposed

to know the laws and regulations of our government; and thus, 6) the concept of "apparent authority" is often inapt when dealing with the government, insofar as the only cognizable restrictions on the agent's authority are deemed known to third parties, shattering any appearance of authority. When opinions include language to the effect that "actual, not apparent, authority is needed to contract on behalf of the government," this is all that they mean. Although the point is often obscured by context or dictum, a review of the development of the different rule for government agents confirms that this notice/inquiry feature is the extent of any difference.

### a. The Supreme Court's Lee opinion.

The Supreme Court's controversial opinion in *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947)—decided by a 5–4 vote over a biting dissent by Justice Jackson—is usually cited as the modern source of a different rule for government agents. *See, e.g., Flexfab, L.L.C. v. United States,* 424 F.3d 1254, 1260 (Fed.Cir.2005); *H. Landau,* 886 F.2d at 324. But the *Merrill* rule can itself be traced back to two authorities. The ultimate source is the Supreme Court's opinion in *Lee v. Munroe,* 11 U.S. (7 Cranch) 366, 3 L.Ed. 373 (1813). This opinion is a rather unlikely foundation for the proposition that the rules of agency are different when government contracts are at issue, for a number of reasons. In the first place, the authority to contract was not even in dispute in *Lee.* The case involved the actions of Washington, D.C. commissioners who without question "were employed and authorized by the public to sell and make contracts for the sale of certain lands lying within th[e] district." *Id.* at 368–69.

Second, the case was not brought to enforce any contract. The suit was brought by an individual who sought a set-off to a judgment he owed the United States, on the ground that a mistaken statement of the commissioners induced him to release third parties from a debt. *Id.* The commissioners had entered into a contract with the third parties, named Morris and Nicholson, to sell them certain lots. Since Morris and Nichol-

son had advanced partial payment to the commissioners that would cover a portion of the lots, the commissioners followed the practice of conveying title to the lots, at the request of Morris and Nicholson, to the purchasers or their designees. *Id.* at 369. Morris and Nicholson proposed to settle their debts with Lee by giving Lee lots equal in value to the debts, and Lee asked the commissioners to confirm that they would transfer to him title to the lots if directed to do so by Morris and Nicholson. *Id.* The commissioners mistakenly believed that the partial payment had not yet been exhausted by the lots already transferred, and answered in the affirmative. Thus, there was no bargained-for exchange, nothing received by the government in return for transfer of title, and the communication, in the words of the Supreme Court, "was altogether gratuitous." *Id.* Lee was proceeding not on principles of contract, but of estoppel.

Third, the Supreme Court disclaimed any intention to carve out a special rule for the government. Lee argued that the case was governed by the rule that estopped the holder of a prior mortgage from claiming priority over a second mortgagee, when the second mortgagee, before lending, asked the first if he held a security interest and was told there was none. *Id.* at 368. The Supreme Court rejected this argument, finding the rule confined to false statements by the principal who had the interest, and not extending to one's agents:

> It is, however, not known to the Court, that the same rule of decision has been extended so as to affect the interests of principals, and particularly of the public, in consequence of similar mistakes made by an agent, nor is it reasonable that such extension should take place, unless it most manifestly appear that the agent was acting within the scope of his authority, and was empowered, in his capacity of agent, to make the declaration or representation which is relied on as the ground of relief.

*Id.* at 368. Thus, while the Court considered "particularly" the interests of the public, it was following a rule applicable to all principals. The Court concluded that the commissioners' factual statements concerning the title to property were not "within the sphere of their official duties," and accordingly denied the relief sought by Lee. *Id.* at 369. The Court explained that, were it to hold otherwise, mistaken utterances by officials responsible for selling public lands could result in the loss of government liens, or even alienation of public property "without any consideration whatever being received." *Id.* at 370.

Thus, the *Lee* opinion did not address any questions about apparent authority to bind the government in a contract, but instead concerned estoppel. But while the concepts can become intertwined—for instance, when someone seeks to estop the government from denying the authority of an agent to enter into a contract—estoppel poses a different set of problems in cases involving the government. Estoppel is based on the notion that parties should be liable for the damage their misrepresentations cause innocent third parties who relied on the statements. Parties arguing estoppel have a bit more to prove—a change in position in reliance on the misrepresentation. *See* RESTATEMENT (SECOND) OF AGENCY § 8 cmt. d (1958); *id.* § 8B cmt. b; RESTATEMENT (SECOND) OF TORTS § 872 (1979). On the other hand, unlike when a contract is recognized under apparent authority, estoppel against a party does not normally entitle that party to any reciprocal contract rights. *See* RESTATEMENT (SECOND) OF AGENCY § 8B cmt. b (1958). Indeed, unless the estoppel is in the context of a contract, the government would have liability imposed without receipt of any consideration. The Supreme Court has yet to find circumstances warranting estoppel against the federal government, *see OPM v. Richmond,* 496 U.S. 414, 421–23, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). The Federal Circuit requires proof of affirmative misconduct by a government agent for estoppel to apply. *Zacharin v. United States,* 213 F.3d 1366, 1371 (Fed. Cir.2000); *Henry v. United States,* 870 F.2d 634, 637 (Fed.Cir.1989).

Estoppel is thus a harsh remedy from the perspective of the one estopped. Moreover, the context of the claim may be critical, keeping in mind that authority may be granted not only expressly, but also (and often) by

implication. The question of whether implied power exists to waive or disregard a law—or to interpret one, *see United States v. Stewart*, 311 U.S. 60, 70, 61 S.Ct. 102, 85 L.Ed. 40 (1940) (holding that the Treasury Dept., not the Farm Loan Board, was authorized to interpret federal tax law)—is quite different from the question of the implied power to contract.[3] By its nature, the former does not even admit of an obvious private analogue. It comes as no surprise, then, that the courts would generally disfavor such a harsh remedy when it would nullify the application of a law or regulation, and accordingly raise the bar for parties seeking this remedy.

### b. Story on Agency.

That the line of cases touching on the apparent authority of government agents to contract is built upon the estoppel case *Lee* has unfortunately obscured the meaning of these cases. That the line rests upon *Lee* is almost certainly due to that opinion having been cited in the other foundational authority for the cases, a treatise by Justice Joseph Story.

In the course of his COMMENTARIES ON THE LAW OF AGENCY ("STORY ON AGENCY"), Justice Story discussed, among other things, the concept that would later be known as apparent authority. Story explained that an agent who is held out to have contracting authority "by any acts, or declarations, or implications" of a principal, binds the principal "notwithstanding he may have deviated from his secret instructions and orders. . . ." STORY ON AGENCY § 133 (6th ed. 1863).[4] One exception to this proposition was when the agent was held out to be "special"—that is, limited to a particular transaction or role. *See id.* §§ 17, 19. When entering into a transaction with a special agent who has claimed a broader

authority to act for his principal, a party acts at its peril, and has a duty to inquire "into the nature and extent of the authority actually conferred." *Id.* § 133 (footnote omitted); *see also id.* § 126 (noting that a special agent cannot bind a principal beyond the authority granted "unless, indeed, he has held him out as possessing a more enlarged authority"). Thus, an agent held out as acting in but a single transaction cannot by his word bind the principal beyond his authority, but agents held out as acting more generally for a principal can—when dealing with the former, a party must inquire into the authority conferred.

Story then, somewhat tentatively, states that "[t]his distinction between the effects of a general and a special agency *seems* (as we shall hereafter see) to be limited to cases of private agency; and to be inapplicable to the case of public agents, who can bind the government, or the public authorities, only to the extent of the powers actually conferred on them." *Id.* § 133 (emphasis added; footnote omitted). The only source for this proposition is *Lee*, and the reader is referred to a later section of the treatise.

This later section—section 307a—contained the language that was routinely repeated or paraphrased in Nineteenth Century opinions discussing the authority of government agents. *See, e.g., Hawkins v. United States*, 96 U.S. (6 Otto) 689, 691–92, 24 L.Ed. 607 (1877) (citing Story); *Whiteside v. United States*, 93 U.S. (3 Otto) 247, 256–57, 12 Ct.Cl. 10, 23 L.Ed. 882 (1876) (same); *Spencer v. United States*, 8 Ct.Cl. 288, 293 (1872) (quoting Story); *Bennett v. United States*, 6 Ct.Cl. 103, 110, 1800 WL

---

3. *But see Heckler v. Community Health Services*, 467 U.S. 51, 64–65 & n. 21, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (in the context of an estoppel claim based on a government agent's interpretation of regulations, the Court applies the law of *apparent authority* to determine agent lacked authority).

4. In this discussion, the Court uses the sixth edition of STORY ON AGENCY, the version current at the time the treatise's language concerning government agents was injected into our case law. *See Cooper v. United States*, 1 Ct.Cl. 85, 89

(1863). The text relevant for our purposes, including footnotes, was identical to that from the earlier versions written by Story himself; thus the Court refers to Story as the author, although the Justice died seventeen years prior to that edition's publication. *See* STORY ON AGENCY, Advertisement (9th ed., 1882) (explaining restoration of text to Story's original and identification of latter editor's work); *compare* STORY ON AGENCY §§ 126, 133, 307a (9th ed. 1882) *with* STORY ON AGENCY §§ 126, 133, 307a (6th ed. 1863).

714 (1870) (same); *The Floyd Acceptance Case*, 1 Ct.Cl. 270, 296, 1865 WL 1987 (1865) (same); *Cooper v. United States*, 1 Ct.Cl. 85, 89 (1863) (same). Because of its importance to the development of the law in this area, the section is reprinted here in full:

> In respect to the acts and declarations and representations of public agents, it would seem that the same rule does not prevail, which ordinarily governs in relation to mere private agents. As to the latter, (as we have seen,) the principals are in many cases bound, where they have not authorized the declarations and representations to be made. But, in cases of public agents, the government, or other public authority, is not bound, unless it manifestly appears that the agent is acting within the scope of his authority, or he is held out as having authority to do the act, or is employed, in his capacity as a public agent, to make the declaration or representation for the government. Indeed, this rule seems indispensable, in order to guard the public against losses and injuries arising from the fraud or mistake, or rashness and indiscretion of their agents. And there is no hardship in requiring from private persons, dealing with public officers, the duty of inquiry, as to their real or apparent power and authority to bind the government.

STORY ON AGENCY § 307a (6th ed., 1863) (footnotes omitted). A few observations are in order. First, as in the preview discussed above, Story introduces the proposition with language that is less-than-certain, stating "it would seem." Story, of course, had no choice but to speculate about the concept; the federal government would not waive sovereign immunity to allow breach of contract claims to be brought against it until the mutual predecessor of our court and of the Federal Circuit, the Court of Claims, was created nearly a decade after Story's death. The rule would have been developed at that time, if at all, in the state courts.

Which brings us to the second point concerning the passage: Unlike the rest of Justice Story's treatise, which is impressively buttressed by footnotes thick with authority from English courts, from other treatises, and from state and federal court opinions, section 307a initially rested on just one citation—to the Supreme Court's opinion in *Lee*. *See id.* § 307a at 367 n. 2. And this was cited to support the penultimate sentence, concerning the purpose of protecting the public from financial losses. But *Lee*, as was discussed earlier, was an estoppel case which did not claim to draw any distinctions between private and public principals.

Third, the passage does not state that the government cannot be contractually bound by the actions of an agent with apparent authority. Instead, Story states that the government *can* be bound when "it manifestly appears that the agent is acting within the scope of his authority...." *Id.* § 307a. Perhaps this concept of "manifestly apparent authority" is taken from *Lee*, which said that an agent might estop a principal when "it most manifestly appear that the agent was acting within the scope of his authority," in a discussion which purported to discuss the law of agency generally, and not some government variation. *Lee*, 11 U.S. (7 Cranch) at 368. But Story goes on to explain further that the government *is* bound when the agent "is held out as having authority to do the act," STORY ON AGENCY § 307a (6th ed., 1863), which, of course, is one manner of creating apparent authority. Story then adds that when the agent is employed to make a statement for the government, even unauthorized statements of the former bind the latter—which can be another example of apparent authority. *See id.*

Having stated, in the alternative, three circumstances in which unauthorized statements can bind the government under apparent authority, Story leaves one to wonder just what the different rule for the government is. The mystery is cleared up by the last sentence of the section which appears to be the key to the paragraph. Story explains that what is being required is a "duty of inquiry" as to "real or apparent power and authority to bind the government." *Id.* And having stated that manifestly apparent authority, or authority that is held out by the government, or that is based on a statement by an agent empowered to make statements, *will bind* the government, the duty to inquire

that Story was talking about must have concerned limitations on authority, not the conferral of authority. Otherwise, the third sentence of the section—the three ways to bind—would fail to make sense.

### c. The rule develops.

Once the Court of Claims was created, and then allowed to produce final judgments that could be reviewed in the Supreme Court,[5] case law could finally develop applying agency principles to federal contracts. In its very first opportunity to address the matter, the Court of Claims relied solely on section 307a of STORY ON AGENCY to hold that the apparent authority of government agents to contract is limited by laws and regulations that are publicly available. *Cooper v. United States,* 1 Ct.Cl. 85, 89 (1863). Significantly, the government acknowledged that federal agents could have apparent authority to contract, but argued that the agents in question were not held out to have anything but special authority that was limited. *See id.* at 86. The case concerned a contract to buy used muskets from the War Department. Although the regulations issued under the act authorizing such sales required that they be done by public auction, the transaction was a private sale, which was subsequently revoked prior to shipment of the arms. *Id.* at 85–86. The Court rejected the claim for breach of contract damages, noting that the rules concerning agents who exceed actual authority "are materially different" for public officers.

The Court of Claims explained:

This difference arises, in some degree, from the fact that the actual powers and authorities of a private agent for the most part *depend upon private instructions* communicated by his principal, and in many instances, *cannot be known* to those with whom he deals on behalf of his principal. In such cases his apparent power and authority may, and often do, override their actual limitations. But with public officers or agents the case is different. In a *majority* of instances their powers are con-

ferred, limited, and regulated by law, and hence *presumed to be equally well known and understood by all.*

*Cooper,* 1 Ct.Cl. at 89 (emphases added). The Court rejected the breach claim because the relevant act and regulations "were equally accessible to the claimant as they were to the officers of the government, and he was equally bound to know them." *Id.* Thus, the Court of Claims understood the Story passage to mean only that private parties are responsible for knowing the limitations that are openly placed on government agents with whom they contract—apparent authority cannot be relied upon when the limitations, though unknown to the private party, were publicly available. By contrasting public limitations with the circumstance of instructions which "cannot be known," the Court was not rejecting the binding nature of the apparent authority of government agents in the latter circumstance. And by stating that in a majority of—as opposed to all—cases a public agent has powers expressly conferred by law, the Court recognized that a public agent's powers may be otherwise derived.

On its next occasion to address the topic, the Court of Claims again relied upon section 307a. *See Peirce v. United States,* 1 Ct.Cl. 270, 296 (1865), *aff'd sub nom. The Floyd Acceptances,* 74 U.S. (7 Wall.) 666, 19 L.Ed. 169 (1869).[6] In *Peirce,* the Court reiterated that Story's proposition meant "that the duty of inquiry as to the power of a public officer is much more strict than arises between private parties." *Peirce,* 1 Ct.Cl. at 296. The matter concerned whether the Secretary of War could accommodate a contractor by signing a draft for the future payment of money, which the contractor then sold to prefinance the obligations of a contract. *Id.* at 271–72. Although the Secretary possessed broad powers to contract, this pledging of the government's credit without receipt of any consideration was viewed by the Court as an incursion into Congress's constitutional power to borrow. *See id.* at 280–81. In addition

---

5. *See* Act of March 17, 1866, 14 Stat. 9.

6. Erroneously, the Court of Claims cited the passage as section 308 from STORY ON AGENCY. *Compare Peirce,* 1 Ct.Cl. at 296 *with* STORY ON AGENCY

§ 307a (6th ed., 1863). There was also a discrepancy in the spelling of the claimant's surname—the Supreme Court spelled it "Pierce," contrary to the Court of Claims' "Peirce."

to the Constitution, the claimant, who held the bills, was deemed to have knowledge of a statute forbidding the Executive branch from advancing funds to contractors: "This being a public statute, a law of the land, he was bound to know it, and take notice of it in any event." *Id.* at 297. The Supreme Court affirmed, primarily on the grounds that the Secretary's act was not expressly authorized by statute, nor had he possessed the power implicitly—that is, "as an incident to the exercise of some other power." *Floyd,* 74 U.S. (7 Wall.) at 680. Without mentioning section 307a, the Supreme Court also cited the statute forbidding the advance of funds, and explained that "[e]very citizen of the United States is supposed to know the law"—thus, the claimant had notice of the lack of authority. *Id.* at 682.

With these early cases, the Court of Claims and the Supreme Court established the mode of analyzing this type of claim. If there was a question of the authority of the government agent to bind the government in a transaction, the court would look to see if authority were expressly granted by law or statute or if it were possessed by implication, by the government having held out the agent to have related powers. Then the court would look to public restrictions on this authority, in the form of laws or regulations. The Court of Claims would, on occasion, remark that this latter exercise was no different for public than for private agents, as parties who have notice of limits on authority cannot insist that principals be bound by actions that exceed them. *See, e.g., Curtis v. United States,* 2 Ct.Cl. 144, 152, 1801 WL 469 (1866); *Henderson v. United States,* 4 Ct.Cl. 75, 83, 1800 WL 612 (1868) (stating "there is no reason why the rule should be relaxed in relation to public officers"). The section from STORY ON AGENCY continued to be quoted, emphasizing the notice of published limits on public agent's authority. *See Bennett,* 6 Ct.Cl. at 110; *Spencer v. United States,* 8 Ct.Cl. 288, 293, 1872 WL 5768 (1872); *cf. Hawkins,* 96 U.S. (6 Otto) at 691–92 (discussing notice of the laws separately from the paraphrasing of Story on authority); *Whiteside,* 93 U.S. (3 Otto) at 256–57 (same). These opinions also cited *Lee* as the source of the rule being applied. *See*

*Bennett,* 6 Ct.Cl. at 110; *Spencer,* 8 Ct.Cl. at 293; *Hawkins,* 96 U.S. (6 Otto) at 692; *Whiteside,* 93 U.S. (3 Otto) at 257. And while dictum such as the Court of Claims' subsequent characterization of *Peirce* as providing that "the Government is liable only to the extent of the power it has actually given to its officers," *Ferris v. United States,* 28 Ct.Cl. 332, 345 (1893), might suggest that express authority was needed to bind and that secret instructions could unbind, the cases would follow the mode of analysis as set out above.

Thus, the Court of Claims would first determine if the power to contract were within the scope of a government agent's duties— looking not just at express powers granted by statute, *see Bennett,* 6 Ct.Cl. at 109–110 (finding that special agent was not granted power to warrant condition of cotton sold at a public auction), but also power implicitly established by the factual record. *See, e.g., Peirce,* 1 Ct.Cl. at 279–80, 289–91 (asking whether "any duty to be performed by the Secretary . . . requires he should possess the power and discretion claimed" and whether "usage" established the requisite authority); *Ferris,* 28 Ct.Cl. at 343 (determining that agent merely had power of "superintending the performance of the work" on the contact); *Jacob Reed's Sons, Inc. v. United States,* 60 Ct.Cl. 97, 105–06 (1925) (determining that "authority to expedite the production" of supplies did not imply power "to rent and equip buildings"); *Burney Axe v. United States,* 60 Ct.Cl. 493, 495 (1925) (finding that "an officer charged with such duties as" agent in question would not have authority to agree to award future contracts to plaintiff, based on the proof); *Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 711, 468 F.2d 922 (1972) (finding that employee with power "to recommend approval of contracts," and another with "responsibility to monitor" performance and review change orders lacked authority to contract). Dictum contained in at least one opinion implied that statutory authorization was required, loosely stating "[n]o officer of the Government has the power to bind the United States, in the absence of congressional authority." *Byrne Org. v. United States,* 152 Ct.Cl. 578, 586, 287

F.2d 582 (1961) (citation omitted). But curiously, the authority cited for the proposition, *Whike Constr. Co. v. United States*, 135 Ct. Cl. 126, 140 F.Supp. 560 (1956), says nothing of the sort—and clearly held that the lawyers in a contracting officer's office bound the government based on an implied manifestation of authority. *See id.* at 130–31, 140 F.Supp. 560 (explaining that the lawyers "had such positions and were acting in such circumstances as to lead any normal person to regard them as having capacity to act in the matter").

The Federal Circuit, as the appellate successor to the Court of Claims, maintained the same approach of not limiting the search for authority to express provisions of law, but also looking for power implied by the factual record. *See, e.g., S.E.R., Jobs for Progress, Inc. v. United States*, 759 F.2d 1, 4 (Fed.Cir. 1985) (finding that "the record lacks any indication of the capacity in which" government agent served); *City of El Centro v. United States*, 922 F.2d 816, 821 (Fed.Cir. 1990) (determining agents "had no care-providing duties to perform" upon which "an implied authority to obligate government resources" can be based). Perhaps because it was more typically a factual matter, the scope of the duties implicitly granted to agents came less frequently before the Supreme Court, but still did so on occasion. *See, e.g., Floyd*, 74 U.S. (7 Wall.) at 680 (considering whether the authority at issue "ar[o]se as an incident to the exercise of some other power"); *Baltimore & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923) (noting there was no finding that the agent had the requisite authority); *cf. Hawkins*, 96 U.S. (6 Otto) at 693 (determining that claimant had notice of lack of authority, as contract required Treasury Secretary's consent); *Monroe v. United States*, 184 U.S. 524, 527, 529, 37 Ct.Cl. 551, 22 S.Ct. 444, 46 L.Ed. 670 (1902) (explaining that contract by its terms required approval by Chief of Engineers).

If it appeared that some sort of authority to contract on behalf of the government was possessed by an agent, the courts' next step would be to determine if any laws or regulations restricted this authority. These restrictions could be procedural in nature, such as the requirement that a contract be in writing, or that a certain determination be made as a condition precedent. *See, e.g., Wilber Nat'l Bank v. United States*, 294 U.S. 120, 124, 55 S.Ct. 362, 79 L.Ed. 798 (1935) (statute and regulations required proof of insurability before lapsed insurance policy could be reinstated); *Whiteside v. United States*, 93 U.S. (3 Otto) 247, 255, 12 Ct.Cl. 10, 23 L.Ed. 882 (1876) (regulation required that terms of contract be in writing); *Mil–Spec Contractors, Inc. v. United States*, 835 F.2d 865, 867–68 (Fed.Cir.1987) (regulation required modification in writing, signed by both parties); *Ship Const. & Trading Co. v. United States*, 91 Ct.Cl. 419, 435, 441 (1940) (statute required appraisement of ships before sale); *Horton v. United States*, 57 Ct.Cl. 395, 403, 1922 WL 1836 (1922) (law required contracts to be written and executed); *Henderson*, 4 Ct.Cl. at 80–82 (statutes required contract to be in writing and required advertising unless an emergency was expressly found); *cf. Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432–33 (Fed.Cir.1998) (delegation of authority, known to contractor, required prior, written approval of contract).

The restrictions sometimes concerned more substantive matters, such as expenditure limits and bans on certain terms or on certain potential contractors. *See, e.g., Merrill*, 332 U.S. at 385–86, 68 S.Ct. 1 (regulations prohibited insurance coverage of certain reseeded acreage); *Sutton v. United States*, 256 U.S. 575, 578–79, 56 Ct.Cl. 477, 41 S.Ct. 563, 65 L.Ed. 1099 (1921) (statutes imposed appropriations limit); *Bradley v. United States*, 98 U.S. (8 Otto) 104, 113–15, 25 L.Ed. 105 (1878) (same); *Whiteside*, 93 U.S. (3 Otto) at 250–52, 255 (regulation limited size of payment to twenty-five percent of proceeds unless Treasury Secretary approved); *Floyd*, 74 U.S. (7 Wall.) at 682–83 (statute expressly prohibited payment of advances to contractors); *ATL, Inc. v. United States*, 735 F.2d 1343, 1345 (Fed.Cir.1984) (statute prohibited business with suspended contractors); *California–Pacific Utilities Co. v. United States*, 194 Ct.Cl. 703, 716–18 (1971) (statute interpreted to ban indemnifi-

cation clauses); *Curtis,* 2 Ct.Cl. at 150–51 (statute limited expenditures under the contract); *cf. Branch Banking & Trust Co. v. United States,* 120 Ct.Cl. 72, 87, 89, 92–93, 98 F.Supp. 757 (1951) (finding "nothing in [an] act expressly or by inference prohibiting" the action, and "the scope of the contract was not limited by any statute").

Some restrictions required the involvement or participation of other government officials for the contract to be valid. *See, e.g., Whiteside,* 93 U.S. (3 Otto) at 250 (regulation required Treasury Secretary's approval); *Filor v. United States,* 76 U.S. (9 Wall.) 45, 48, 19 L.Ed. 549 (1869) (law required quartermaster-general's approval); *Trauma Service Group v. United States,* 104 F.3d 1321, 1327 & n. 4 (Fed.Cir.1997) (regulation required submission of agreements to two other officials for approval); *Jascourt v. United States,* 207 Ct.Cl. 955, 956 (1975) (apparent authority did not bind government when published regulations gave other officials contracting authority).

This second step of looking for publicly-enacted restrictions on contracting authority often resulted in a determination that the government agent in question had contravened a statute or regulation. Thus, the issue of the contract's legitimacy raised a question that could be viewed as a matter of estoppel—specifically, whether the government should be prevented from asserting the relevant laws or regulations, thereby allowing the would-be contractor to establish the contract. As a result, the Supreme Court bound the line of cases concerning authority to contract with those concerning estoppel. *See, e.g., Merrill,* 332 U.S. at 384, 68 S.Ct. 1; *Wilber Nat'l Bank,* 294 U.S. at 123–24, 55 S.Ct. 362; *Utah Power & Light Co. v. United States,* 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791 (1917) (stating the government "is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit"); *cf. Filor,* 76 U.S. (9 Wall.) at 49 (holding government is not estopped by acts that are unauthorized). Perhaps this linkage was inevitable, since the former line of cases actually grew out of the estoppel case of *Lee.*

*See, e.g., OPM v. Richmond,* 496 U.S. at 419–20, 110 S.Ct. 2465 (discussing *Lee*). As was noted above, the concept of estoppel against the government has not been favored by our courts. *But see Emeco Industries, Inc. v. United States,* 202 Ct.Cl. 1006, 1014–19, 485 F.2d 652 (1973) (holding the government to be estopped from denying the existence of a contract into which it never entered). This lack of favor is motivated by at least two concerns: the breach of the separation of powers that would result if the actions of an agent of the Executive were allowed to invalidate laws, *see, e.g., Peirce,* 1 Ct.Cl. at 281–82; and the lack of any consideration received by the government.

The lack of consideration was what alarmed the Supreme Court when it started the ball rolling with the *Lee* opinion. *See Lee,* 11 U.S. (7 Cranch) at 370 (warning against a rule under which the dispensing of bad information by a government agent could destroy public liens and "even produce alienations of [large tracts of real estate] without any consideration whatever being received"); *see also Floyd,* 74 U.S. (7 Wall.) at 682 (finding Secretary of War's acceptance of commercial paper to be "without consideration"). Indeed, many of the estoppel cases do not turn on transactions in which the government might have gained a valuable right, but instead concern unauthorized actions or statements upon which another party may have relied. *See, e.g., Utah v. United States,* 284 U.S. 534, 545–46, 52 S.Ct. 232, 76 L.Ed. 469 (1932) (statements of a Special Asst. Attorney General could not estop government from asserting its rights to mineral lands); *Utah Power & Light Co.,* 243 U.S. at 408–09, 37 S.Ct. 387 (government not estopped by statements that certain uses of public land were not prohibited); *Pine River Logging & Imp. Co. v. United States,* 186 U.S. 279, 291, 22 S.Ct. 920, 46 L.Ed. 1164 (1902) (acquiescence of government agent will not estop government from enforcing limit on logging); *Hart v. United States,* 95 U.S. (5 Otto) 316, 318, 24 L.Ed. 479 (1877) (government not estopped by failure of officer to collect tax before allowing distilled spirits to be removed from warehouse); *Whiteside,* 93 U.S. (3 Otto) at 257–58 (government not estopped by officer's unautho-

rized return of seized cotton); *see also Stewart,* 311 U.S. at 70, 61 S.Ct. 102 (determining that statements issued by Farm Loan Board cannot bind government to an interpretation of the tax code); *Cooke v. United States,* 91 U.S. (1 Otto) 389, 402, 23 L.Ed. 237 (1875) (holding the acceptance of notes for payment by a Treasury official did not establish their validity).

Of course, the lack of consideration is not the issue when the authority of an agent to contract on behalf of the government is questioned. And although the Court of Claims recognized *Merrill* to be a case based on principles of estoppel, *see, e.g., Bornstein v. United States,* 170 Ct.Cl. 576, 582, 345 F.2d 558 (1965); *Fansteel Metallurgical Corp. v. United States,* 145 Ct.Cl. 496, 500–01, 172 F.Supp. 268 (1959), the fact that estoppel underlies both the beginning point *(Lee)* and the end point of the Supreme Court's line of cases that is the source of the "different" rule concerning government agents should not obscure the meaning of this rule. Again, the reason that estoppel is implicated is that the rule concerns publicly-enacted restrictions on authority—when such restrictions, in statutes or regulations, would prevent the alleged contract from being formed, a contract claim amounts to a request that these be deemed waived. The rule, from its initial enunciation in STORY ON AGENCY through its reiteration in *Merrill,* is based on the notion that parties are *on notice* of publicly-enacted restrictions on a government agent's authority, whether they know them or not. As the Court explained in *Merrill:*

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority *may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power.* And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.

*Merrill,* 332 U.S. at 384, 68 S.Ct. 1 (emphasis added) (citing *Utah Power & Light Co.,* 243

U.S. at 409, 37 S.Ct. 387; *Stewart,* 311 U.S. at 70, 61 S.Ct. 102; and *Floyd,* 74 U.S. (7 Wall.) 666, 19 L.Ed. 169).

This rule has nothing to do with the apparent authority that results from an agent's violation of secret instructions. Nor does it require an express statutory authorization to contract. Instead it concerns restrictions on authority, in publicly-available laws and regulations. *See Merrill,* 332 U.S. at 384–85, 68 S.Ct. 1 ("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents." (citation omitted)); *see also LDG Timber Enterprises, Inc. v. Secretary,* 114 F.3d 1140, 1143 (Fed.Cir.1997) (holding that since no publicly-available statute, regulation, or rule restricted the agent's authority, burden fell on government to prove lack of authority); *cf. NI Industries, Inc. v. United States,* 841 F.2d 1104, 1107–08 (Fed.Cir.1988) (holding contracting officer abused her discretion in denying a contract change request on the basis of an unpublished substantive regulation). At bottom, it is not really a "different" rule at all from those applying to private parties, for whom knowledge of a restriction on authority would prevent the formation of a contract. *See, e.g.,* RESTATEMENT (SECOND) OF AGENCY §§ 27, 166 (1958). In this line of cases, no less than in others, it remains true that when the government "comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there." *Cooke,* 91 U.S. (1 Otto) at 398; *cf. American Soc. Mech. Engrs., Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 570–71, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (holding that "an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce," may be liable for the torts of its agents who act under apparent authority (citation omitted)).

*3. The Reason of the Rule*

That the different rule is confined to this particular aspect of dealing with the government—that is, the knowledge of laws and regulations that is imputed to everyone—is

confirmed by reviewing the varying explanations for a different treatment of government agents. Under the rule of law, judicially-created doctrines rest on the twin pillars of reason and authority. The reason of rules must be known for at least two reasons—to maintain the confidence of the public that judges are not acting capriciously, and to enable lower court judges to properly apply and, when need be, extend these rules to cover the circumstances of the cases presented to them.[7]

Reviewing the cases concerning whether agents have the authority to contract on behalf of the government, no rationale emerges that distinguishes government entities from other entities, except for the public nature of their acts. Nine years before the *Lee* decision, the Supreme Court held that the agents of corporations operate under different rules than those of individuals. *See Head & Amory v. Providence Ins. Co.*, 6 U.S. (2 Cranch) 127, 169, 2 L.Ed. 229 (1804). The basis for this difference was that acts of incorporation were public laws that specified and restricted the powers of corporations, in contrast to the situation of the individual who "has an original capacity to contract and bind himself in such manner as he pleases." *Id.* at 168. The Supreme Court maintained this rule for corporations for over half a century, *see Pearce v. Madison & Indianapolis R.R. Co.*, 62 U.S. (21 How.) 441, 443–44, 16 L.Ed. 184 (1858), until modifying it with a broader concept of apparent corporate authority in 1860. *See Zabriskie v. Cleveland, Columbus, & Cincinnati R.R. Co.*, 64 U.S. (23 How.) 381, 397–98, 400–01, 16 L.Ed. 488(1859) (upholding a corporate action that did not conform to legal requirements, and finding issued securities valid based on "apparently official acts").

But the notion that "persons dealing with the managers of a corporation must take notice of the limitations imposed upon their authority by the act of incorporation," *Pearce*, 62 U.S. (21 How.) at 443, was echoed in the ensuing jurisprudence concerning government agents. *See, e.g., Floyd*, 74 U.S. (7 Wall.) at 682 ("Every citizen of the United States is supposed to know the law...."); *Cooke*, 91 U.S. (1 Otto) at 402 (explaining that people dealing with government agent "are presumed to know his exclusive authority, for it is public law"); *Sutton*, 256 U.S. at 579, 41 S.Ct. 563; *Wilber National Bank*, 294 U.S. at 124, 55 S.Ct. 362 (assuming "statutes and regulations which govern" federal agency "are known by those who deal with it"); *see also Cooper*, 1 Ct.Cl. at 89; *Curtis*, 2 Ct.Cl. at 152 (holding "statute became to the claimant notice in law and in fact"); *Bennett*, 6 Ct.Cl. at 110 ("This act is a public law, and all parties ... are bound to take notice of its provisions."); *Horton*, 57 Ct.Cl. at 403; *Jascourt*, 207 Ct.Cl. at 956 (holding claimant was "deemed to have had notice" of published regulations). At least two states initially based government agents' limitations on the limits generally applying to corporate agents. *See Mayor & City Council of Baltimore v. Eschbach*, 18 Md. 276, 282, 1862 WL 2320 (1862) (explaining distinction between cases involving agents of individuals, in which "the extent of authority is necessarily known only to the principal and the agent," and agents of corporations, for which limits are "a matter of record in the books of the corporation, or of public law"); *Salem Bank v. Gloucester Bank*, 17 Mass. 1, 29, 1820 WL 1478 (1820) (noting distinction because "authority is created by statute, or is matter of record in the books of the corporation, to which all may have access who have occasion to deal with the officers"). Over time, limitations included in publicly-enacted acts of incorporation appear to have become less commonly a consideration in determining the authority of agents of privately-owned corporations—thereby resulting in a different treatment of government agents, for whom public acts have remained relevant. Thus, it is the inherent ability of the government to enact limits on authority through legislation or published regulation—two means that are at least theoretically accessible to all—that is reflected in this rule concerning an area of agency law in which the knowledge of the parties is so critical.

---

7. As for authority, proper respect for the separation of powers requires judges to not usurp the legislative power, and to confine the development of judicially-created doctrines to areas within the judicial domain.

The other rationales offered in support of the authority rules for government agents provide no reason to treat people dealing with government agents differently from those dealing with the agents of corporate actors. Sometimes, the specter of collusive or corrupt officers is raised. In *Byrne Organization,* for instance, the Court of Claims stated "a contrary result could conceivably create a situation where two collusive people could effect a drain of the public treasury." *Byrne Org.,* 152 Ct.Cl. at 586, 287 F.2d 582. The Court was relying on the Supreme Court's *Whiteside* opinion, which in turn cited the Maryland state court opinion in Eschbach. *See Whiteside,* 93 U.S. (3 Otto) at 257 (citing *Eschbach,* 18 Md. at 282). But Eschbach, as was noted above, employed a rule that was applicable to both private corporations and governments, and cited as its authority three opinions which did not draw any distinctions between private and public agents—the Massachusetts Supreme Court's *Thayer v. City of Boston,* 36 Mass. (19 Pick.) 511 (1837), and the aforementioned Salem Bank and Lee. *See Eschbach,* 18 Md. at 283 (citing *Salem Bank,* 17 Mass. at 29; *Thayer,* 36 Mass. (19 Pick.) at 516; and *Lee,* 11 U.S. (7 Cranch) 366, 3 L.Ed. 373).[8] It bears mentioning that the fear that mistakes by an official, who "by inadvertence or incautiously giving information to others," would cause the forfeiture of a property interest "without any consideration whatever being received," moved the Supreme Court to proclaim in Lee: "It is better that an individual should now and then suffer by such mistakes, than to introduce a rule against an abuse, of which, by improper collusions, it would be very difficult for the public to protect itself." *Lee,* 11 U.S. (7 Cranch) at 370. The Court did not state that parties who provide consideration to the government under an alleged contract should "suffer," and based its rule on the difference between the statements (and knowledge) of principals as opposed to agents, not on distinctions between government and other principals. See *Lee,* 11 U.S. (7 Cranch) at 368. Nor was there provided a

rationale why private corporations should remain vulnerable to such "improper collusions."

Variations on the theme of avoiding a drain on the treasury are often offered to justify the rule for government agents, although this reasoning could embrace all manner of special treatment for the government, and cannot explain why the same rules should not be employed to prevent a similar draining of private coffers. For instance, in *Ferris,* the Court of Claims warned against the danger of placing "the rights of the public ... within the power of every agent who is in any way connected with the public service." *Ferris,* 28 Ct.Cl. at 343. This fear is, of course, exaggerated—under the normal rules concerning apparent authority, such authority is not possessed by *every* agent of a principal, but only by those for whom the principal is responsible for the appearance of contracting authority. *See* RESTATEMENT (SECOND) OF AGENCY § 8 cmt. b, § 27 cmt. a, § 49 cmts. b, c. Thus, statements such as "[i]f all Government employees could, of their own volition, enter into contracts obligating the Government, then federal expenditures would be wholly uncontrollable," *Monarch Assurance P.L.C. v. United States,* 244 F.3d 1356, 1360 (Fed.Cir.2001) (citing *El Centro,* 922 F.2d at 820), are entirely beside the point. Apparent authority to contract would never extend to all government employees, any more than it does to all employees of corporations, which seem to have survived without a special dispensation. Thus, only a fraction of the three million or so government employees would have to be controlled, and such monitoring can take place at an agency or sub-agency level, likely making the numbers similar to those managed by the typical corporation.

Although the argument does not appear to have made its way into opinions relevant to our jurisdiction, one state court opinion did attempt to explain why, for the question of contract ratification, dealings with government (municipal) corporations should be

---

8. The *Thayer* opinion recognized that a city could be liable for the torts of officials acting with implied authority, finding "no sufficient ground for a distinction in this respect, between cities and towns and other corporations." *Thayer,* 36 Mass. (19 Pick.) at 516; *see also id.* at 515 (describing authority held "by the nature of the duties and functions with which [the officers] are charged, by their offices, to act upon the general subject matter").

treated differently from those with private ones. In *Mayor & City Council of Balt. v. Reynolds*, 20 Md. 1 (1863), Maryland's highest court described the salient feature of "private corporations aggregate" to be that they are "governed by boards of directors, representing stockholders, whose corporate capital is invested for their private advantage." *Id.*, 20 Md. at 12; *see also id.* at 14 (explaining that "individuals and private corporations . . . act for their own interest and advantage, and their property or common capital is liable for their contracts"). This, however, is more a difference of degree than kind, as under our system of government the hope is that the gains to taxpayers due to the stability and security provided by the government outweigh the cost of the taxes invested.[9] Taxpayers, then, have a similar interest to other "investors" in the efficient use of the resources they contribute. To be sure, the interest of any individual taxpayer is less direct and intense than the profit motive of private shareholders, and thus taxpayers would not be expected to monitor their public agents as closely as private investors would their corporate officers. *But see Wyman v. Hallowell & Augusta Bank*, 14 Mass. 58, 61 (1817) (basing limits to authority of bank's agents on existence of "numerous stockholders in a bank, scattered as they often are"). But one questions whether this supports a rule which eliminates the need for the monitoring of government agents, rather than one which recognizes and strengthens these weak monitoring incentives.[10]

Of all the reasons given for the rule concerning the authority of government agents, only one distinguishes government from private organizations—its ability to place everyone on notice of limits on authority, by passing statutes or issuing published regulations.

Private corporations, too, have many employees, and would be depleted of resources if all employees could bind them in contracts. And it is no more fair for the investors in a private enterprise to be bound by the contracts made by agents with apparent authority, than it would be for taxpayers to similarly bear the costs of such contracts. Not coincidentally, the "public notice" reason traces back to the "duty of inquiry" concept expressed in section 307a of STORY ON AGENCY; is the reason provided by the Supreme Court in *Merrill;* and seems to be the only authoritative (and reasonable) basis for the rule. *See Merrill*, 332 U.S. at 384–85, 68 S.Ct. 1.

### 4. The Authority to Contract May be Implied

If the "actual authority" that is sometimes said to be necessary to bind the government in a contract meant express authority, or if the would-be contractor's duty of inquiry amounted to a requirement that the express authority to contract be found embodied in a law or regulation, this could pose a strong disincentive to transacting with the government. But, as explained above, the authority to contract is not limited to express authority, but may also be implied. *See also* JOHN CIBINIC, JR. & RALPH C. NASH, JR., FORMATION OF GOVERNMENT CONTRACTS 95–98 (3rd ed. 1998) (CIBINIC & NASH). The existence of implied authority to contract on behalf of the government has long been established, dating back to some of the earliest published decisions of our predecessor. *See, e.g., Peirce*, 1 Ct.Cl. at 280 (considering whether there was "any duty to be performed by the Secretary of War that requires he should possess the power and discretion claimed"), *aff'd sub nom. Floyd*, 74 U.S. (7 Wall.) at 680 (recognizing that au-

---

**9.** *Cf.* THE DECLARATION OF INDEPENDENCE para. 2 (U.S.1776) (identifying rights to life, liberty, and enjoyment of property, and proclaiming "That to secure these Rights, Governments are instituted among Men, deriving their just Powers from the Consent of the Governed").

**10.** For a good discussion of the stronger incentives to monitor private sector agents, see JAMES M. BUCHANAN, *The Achievement and the Limits of Public Choice in Diagnosing Government Failure and in Offering Bases for Constructive Reform, in* POLITICS AS PUBLIC CHOICE 120 (2000) (explaining

that "behavior is more likely to be monitored carefully by the residual claimants to the firm's profits," in contrast to government agencies, for which "[t]here are no residual claimants in monitoring roles"). *See also* GORDON TULLOCK, *Economic Hierarchies, Organization and the Structure of Production, in* BUREAUCRACY 280–82, 409, 411 (Charles K. Rowley ed., 2005); Gordon Tullock, *The Theory of Public Choice: Bureaucracy, in* GOVERNMENT FAILURE: A PRIMER IN PUBLIC CHOICE 56 (2002).

thority can "arise as an incident to the exercise of some other power").

The concept of implied authority has been recognized by the Supreme Court, *see, e.g., Bradley,* 98 U.S. (8 Otto) at 114 (reviewing appropriation act to see "whether such an authority may be implied"), which has expressed its test as whether the power to be implied "is the usual and appropriate mode" or "the appropriate means" of performing a duty, or of doing what an officer "has a right to do," unless expressly forbidden. *Floyd,* 74 U.S. (7 Wall.) at 680. Cases involving questions of implied authority were decided throughout the history of the Court of Claims, *see, e.g., Philadelphia Suburban Corp. v. United States,* 217 Ct.Cl. 705, 707 (1978) (holding that government officials, none of whom were "formally designated as a contracting officer," may be found based on "facts and circumstances" to have contracting authority "inherent or implied in the authority" they had to procure supplies in emergencies); *Whike Constr. Co.,* 135 Ct.Cl. at 130–31; *Burney Axe,* 60 Ct.Cl. at 495 (determining that, based on duties of government officer, the authority to bind government was lacking); *Jacob Reed's Sons,* 60 Ct.Cl. at 105–06 (looking to see if authority to contract could be implied by the duties of officer); *Bennett,* 6 Ct.Cl. at 110 (finding "no grant, either express or implied, from which" authority to warrant condition of goods could be derived). The Court of Claims would determine whether such authority was "inherent or implied in" a related authority to obtain supplies, *Philadelphia Suburban,* 217 Ct.Cl. at 707, or was "necessarily implied as essential to the performance of a duty imposed" on an agent, *Henderson,* 4 Ct.Cl. at 81; and found the authority to bind the government when its agents "had such positions and were acting in such circumstances as to lead any normal person to regard them as having capacity to act in the matter...." *Whike Constr. Co.,* 135 Ct.Cl. at 131.

■ The Federal Circuit has more recently explained: "Authority to bind the government is generally implied when such authority is considered to be an integral part of the duties assigned to a government employee." *H. Landau,* 886 F.2d at 324 (quoting Cibinic & Nash 43 (1982)). This implied authority to contract must be based upon "at the least, some limited, related authority," *California Sand & Gravel, Inc. v. United States,* 22 Cl.Ct. 19, 27 (1990), *aff'd* 937 F.2d 624 (Fed. Cir.1991). In *H. Landau,* the Federal Circuit suggested that implicit authority could be based on "responsibility for [a] subcontract's administration" and "the authority to draw checks on [a] joint bank account" established for the subcontract. *H. Landau,* 886 F.2d at 324. On the other hand, in *Jacob Reed's Sons,* the Court of Claims found that the implied authority to contract for the rental and equipping of buildings could not be based on the "authority to expedite the production of uniforms and clothing." *Jacob Reed's Sons,* 60 Ct.Cl. at 105. Recently, in *Advanced Team Concepts, Inc. v. United States,* 68 Fed.Cl. 147 (2005), our court found the implied authority to contract based on the duties of "scheduling, hiring, and paying invoices," that were central to an officer's work. *Id.* at 150–51; *see also Hull & Argalls v. County of Marshall,* 12 Iowa 142, 159–60 (1861) (finding that the duty to provide a court house "involves the power to enter into all necessary and lawful contracts"); *cf. Wyman,* 14 Mass. at 62–63 (recognizing that authority to act on behalf of a private corporation may be "express or implied").

■ Thus, it has long been settled that an agent may have an implied authority to contract on behalf of the government, based on a consideration of the duties of that agent, and whether the power to contract was appropriate or essential to their performance.

## C. Did the DEA Agents Possess Contracting Authority?

The plaintiff's contract claim involves three levels of DEA employees: (a) field agents Hearon and Williams; (b) RAC Yarbrough; and (c) Special–Agent–in–Charge ("SAC") Raymond McKinnon of the Seattle regional DEA office, and his subordinate, Donald W. Young.[11] The Court must determine wheth-

11. Plaintiff's counsel also had an indirect contact with the DEA Administrator months after Mr.

er any of these individuals, by virtue of their positions or personally, possessed the requisite authority to bind the DEA in a contract.

### 1. *Express Authority*

■ No statutes or regulations have been identified which delegate contracting authority to SACs, RACs, or field agents. The reorganization plan submitted by President Nixon, which established the DEA, does not concern itself with those levels of officials. *See* Reorganization Plan No. 2 of 1973, 5 U.S.C.App.; *see also* Pub.L. No. 93–253, § 1, 88 Stat. 50, *reprinted in* 5 U.S.C. app. at 427 (1993 & Supp.2005) (amending plan). The Department of Justice regulations for the DEA delegate to the Administrator the responsibility for payment of awards under 28 U.S.C. § 524(c)(2) and purchase of evidence under 28 U.S.C. § 524(c)(1)(F). 28 C.F.R. § 0.101(d). Under a published redelegation of functions, SACs were given authority to conduct enforcement hearings, to take custody of seized property, to release certain information and authorize the testimony of certain officials, to take custody and dispose of seized controlled substances, and to sign and issue subpoenas, but there is no mention of any contracting authority. App. to Subpart R of Part· 0, 28 C.F.R., §§ 2, 4.· Published regulations do not appear to concern the duties or functions of RACs or field agents.

Nor is there evidence of an express delegation of contracting authority to Messrs. Hearon, Williams, Yarbrough, McKinnon, or Young, pursuant to 48 C.F.R. § 1.603–3. The government offers the declarations of Ms. Christinia Sisk, Acting Deputy Assistant Administrator of the DEA Office of Acquisition Management, who "supervise[s] all contract and small purchase activities within the DEA." Def.'s App. at 29 (Sisk Decl. I ¶ 1). The Sisk declarations state that none of the above-mentioned agents' names appear in

DEA records as having been granted the authority to make contracts.[12] *Id.* at 29–30 (Sisk Decl. I ¶ 4), 31–32 (Sisk Decl. II ¶ 4). As Mr. Brunner has produced no evidence to the contrary, the Court concludes that the express authority to contract has not been established for the relevant DEA agents.

Moreover, concerning Messrs. McKinnon and Young, there is no evidence supporting Mr. Brunner's claim that these individuals approved the agreement he allegedly made with the DEA. Neither of these individuals were at the August 3, 1992 meeting at which the alleged contract was made. *See* Def.'s App. at 21 (Brunner depo. tr. p. 39). Plaintiff does not claim to have ever met or talked with either McKinnon or Young, but merely testified that the DEA agents at a prior meeting with him "got a hold of Donald Young." *Id.* (Brunner depo. tr. p. 37). It is not even alleged that Mr. Brunner overheard anyone at the meeting tell Young that a contract was being made with him, let alone discuss its terms. Plaintiff argues that the fact that his deactivation was approved and signed by McKinnon, *see* Def.'s App. at 10, is evidence that McKinnon must have approved the activation in the first place, as a provision in the DEA Agent's Manual states, "[a]n informant will be deactivated by the decision or with the approval of that level of supervision which approved his establishment." *See* Pl.'s Reply at 8 (quoting DEA Agent's Manual § 6612.51(B)). The very next provision in the manual, unfortunately excised from the page submitted in plaintiff's appendix,[13] requires SAC approval of a DEA Form 6 when, as here, "an informant [is] deactivated due to unsatisfactory cooperation or behavior." DEA Agent's Manual § 6612.52(B) *(reprinted in* Def.'s Suppl. Br. at app. 1); *see* Def.'s App. at 10 (DEA Form 6 deactivating plaintiff for "unsatisfactory performance"). No evidence supports plaintiff's speculation of SAC involvement.[14]

Brunner deactivation, when the Administrator wrote a letter to a U.S. Senator in response to an inquiry initiated by Mr. Brunner's counsel. *See* Pl.'s App. at 42–43. The ratification argument based on this letter is discussed below.

**12.** The plaintiff challenges the sufficiency of this declaration on the basis of its having been improperly sworn to without the signature and seal of a notary. The Court finds that the affidavit

comports with the rules. *See* RCFC 56(e); 28 U.S.C. § 1746.

**13.** *Compare* Pl.'s App. at 37 *with* App. to Def.'s Suppl. Br. at 1.

**14.** Evidence in the record shows that Yarbrough, not McKinnon, "gave approval for utilization of" Mr. Brunner. *See* Def.'s App. at 3 (plaintiff's Personal History Report).

## 2. *Implied Authority*

Actual authority to contract, as was discussed above, may be implied by the related duties and powers of a government agent. The question of the contracting authority of DEA agents has been decided on numerous occasions in our court, as well as in one opinion of the Federal Circuit, *see Salles v. United States,* 156 F.3d 1383 (Fed.Cir.1998), and the government argues that these authorities establish that no actual authority, implied or otherwise, was possessed by any of the agents involved in this matter. But when the terms of Mr. Brunner's alleged contract are scrutinized, a major difference between this case and the others stands out: At least one agent involved in the purported contract had the authority to approve payments for at least two of the four alleged monetary promises.

### a. **The authority of RACs to approve payments.**

In this case, the government concedes that RACs such as Mr. Yarbrough "had the authority to approve the payment of expenses and stipends for informants and to recommend the payment of awards." Pl.'s App. at 5 (Def.'s Resp. to Interrog. No. 13); *see also* Def.'s Resp. to Pl.'s Prop. Findings ¶ 10 (finding Yarbrough "had the authority to approve the payment of expenses and stipends (a fixed sum of money paid periodically for services) or salary to Plaintiff"). Indeed, it would have been difficult for defendant to deny that Mr. Yarbrough had the authority to approve payments of salary and expenses to Mr. Brunner, as the record contains numerous vouchers, signed by Mr. Yarbrough as the "approving supervisor," which authorized such payments. Pl.'s App. at 20, 21, 23–30, 36.[15] Plaintiff has testified that Mr. Yarbrough was the DEA agent who promised payment of the salary, the awards based on indictments and sei-

zures, and the relocation expenses that are at issue in this lawsuit, as well as incidental expenses that are not at issue. *See* Def.'s App. at 21–22 (Brunner depo. tr. pp. 38–44). Thus, it is undisputed that at least two categories of these payments—salary and relocation expenses—were within the power of Mr. Yarbrough, a RAC, to approve.

The Court concludes that the RAC's power to spend the DEA's money implicitly includes the power to contract for the same purposes. The RAC may pay an informant a salary, and may reimburse his expenses, out of the DEA's funds. If it is within his discretion to pay this salary in advance, *see* Pl.'s App. at 24 (Sept. 1, 1992 voucher for payment of salary for one-half of Sept.); *id.* at 32 (Oct. 13, 1992 voucher for payment of entire October salary), it seems to be an appropriate exercise of this power to agree in advance to make such payments. *Cf. Englewood Terrace Ltd. Ptshp. v. United States,* 61 Fed.Cl. 583, 590 (2004) (government agency using discretion to agree in advance to a contract renewal). When a government agent has the authority to pay in advance, using the government's money, for a particular service or item, contracting for that service or item would also be "the appropriate means," *Floyd,* 74 U.S. (7 Wall.) at 680, of exercising this power. *Cf. Henke v. United States,* 43 Fed.Cl. 15, 26 (1999) (noting that payments like these, coming from the Purchase of Evidence/Purchase of Information accounts of the DEA, "can be made or obligated in advance"). Indeed, if an agent has the power to pay a salary in advance to a confidential informant, in return for the informant's promise to perform services, then to obtain the informant's promise by merely promising to pay would be a less risky—and, in a sense, lesser—power, from the perspective of the government.[16] A government agent's trading of a promise to pay salary in return for receipt of a service is merely the flip-side of

---

**15.** At least three other vouchers for expenses and salary appear to have been authorized by an acting RAC. *See* Pl.'s App. at 22, 32, 33.

**16.** The Court doubts, however, that a RAC could bind the government to make payments for services performed after that particular RAC had

relinquished his position and thus no longer possessed the authority to spend. In such circumstances, not presented here, a contractor would probably need to show ratification by the RAC's successor or the institution, in order to qualify for damages.

his trading an advance payment in return for a promise to perform the service, and both contractual arrangements are thus integral to the authority to make such payments.

The Court's conclusion that a RAC has the implied authority to contract for payment of salary and expenses, based on the government's concession of the RAC's power to spend DEA money for these purposes, is consistent with the analysis contained in past precedents. In *Philadelphia Suburban,* for instance, the Court of Claims held that the authority to contract might be "inherent or implied in the authority" of a government agent "to procure and use on the spot the necessary or appropriate fire-fighting supplies." 217 Ct.Cl. at 707. Our court recently determined that implied authority to contract existed when "scheduling, hiring and paying invoices for [the service in question] were central to the [agent's] duties." *Advanced Team Concepts,* 68 Fed.Cl. at 151. Another opinion from our court recognized that the "express actual authority to make and approve payments" could be the predicate for the implied authority to contract. *Rob Roy v. United States,* 38 Fed.Cl. 184, 190 n. 18 (1997); *cf. Silverman v. United States,* 230 Ct.Cl. 701, 710, 679 F.2d 865 (1982) (holding that retention and use of transcripts, obtained by an official with the power to approve vouchers for payment, ratified the official's promise to pay); *City of El Centro,* 922 F.2d at 821 (stressing that *Silverman* involved an "official, *who had authority to approve vouchers for payments for goods and services").*

▉ Plaintiff has provided no evidence, however, demonstrating that a similar power was possessed by RACs concerning the payment of awards based on the indictment or conviction of individuals, or the seizure of property. A RAC can only "recommend" award payments. Pl.'s App. at 5 (Def.'s Resp. to Interrog. No. 13). The government conceded that SACs possess the "authority to pay rewards or expenses of up to $25,000 per informant per quarter," *id.; see also* Def.'s Resp. to Pl.'s Prop. Findings ¶ 12, but, as discussed above, Mr. Brunner has no evidence showing that a SAC approved the alleged contract. And not only is there no

evidence to support the power of the lower level DEA field agents, such as Messrs. Hearon and Williams, to authorize payments of these awards, but our court on several occasions has found that such field agents lack the contract authority to promise these awards. *See, e.g., Toranzo-Claure v. United States,* 48 Fed.Cl. 581, 583 (2001); *Doe v. United States,* 48 Fed.Cl. 495, 501-04 (2000); *Cruz-Pagan v. United States,* 35 Fed.Cl. 59, 61-62 (1996).

The Court thus concludes that Mr. Yarbrough, as a RAC, had the authority to contract with Mr. Brunner concerning the alleged salary and expense reimbursement, implicit in the former's power to authorize such payments; and that no DEA agent with whom Mr. Brunner dealt had the authority to bind the government to pay Mr. Brunner awards of any amount. The Court must next consider, though, whether any restrictions have been placed on the RAC's exercise of this implied contracting authority, by statute or published regulation.

### b. *Restrictions on RAC contracting authority.*

▉ As discussed above, publicly-accessible laws or regulations can limit the contracting authority that would otherwise be implied by a government agent's related powers, for potential contractors are on notice of such restrictions. The Federal Circuit has found one such restriction in a provision of the Comprehensive Forfeiture Act of 1984, which concerns the payment of awards from the Department of Justice's Assets Forfeiture Fund ("AFF"). *See Salles,* 156 F.3d at 1384 (citing 28 U.S.C. § 524(c)). But the Court has already concluded that Mr. Brunner's claims that would come from the AFF—the $2,500 award per person indicted and the twenty-five percent of the value of assets seized and forfeited—could not have been a part of any agreement, due to lack of contracting authority on the part of the DEA agents involved. The claims for salary and expenses, which could come from the Purchase of Evidence/Purchase of Information (PE/PI) accounts of the DEA, are not restricted by section 524(c). *See Henke,* 43 Fed.Cl. at 18-19. Thus, the opinions finding

a lack of authority to promise awards from the Assets Forfeiture Fund, due to the restriction found in section 524(c), are not on point. *Cf. Salles*, 156 F.3d at 1384; *Henke*, 43 Fed.Cl. at 26–28; *Khairallah v. United States*, 43 Fed.Cl. 57, 61–64 (1999) (finding no contractual authority to promise to pay award of twenty-five percent of assets forfeited).

The government also argues that provisions and procedures contained in the DEA Agent's Manual preclude contractual authority. *See* Def.'s Mot. Summ. J. at 10; Def.'s Opp. & Reply at 4–5; Def.'s Suppl. Br. at 4. But knowledge of the contents of this manual, which is not a published regulation accessible to the public, cannot be expected or imputed under the "duty of inquiry" falling on would-be contractors. *See* STORY ON AGENCY § 307a (6th ed., 1863). While "the appearance of rules and regulations in the Federal Register gives legal notice of their contents," *Merrill*, 332 U.S. at 385, 68 S.Ct. 1, only our court's opinions have brought these provisions of the internal manual to light.[17] And Mr. Brunner would not have had the benefit of our first discussion of the manual, in an opinion issued March 1, 1996, *see Cruz–Pagan*, 35 Fed.Cl. at 61, when he discussed his arrangement with the DEA agents in August, 1992.

Moreover, the manual provision relied upon by the government—which is the basis of our past precedents—like section 524(c) concerns awards paid from the AFF. *See* Def.'s App. at 14–17 (DEA Agent's Manual § 6612.44). The prohibitive language stating "[o]ffices must not promise any awards in any amount to an individual," *id.* at 17 (DEA Agent's Manual § 6612.44(C)(2)), is clearly limited to awards from that fund, and is no constraint on promises of salary or expense reimbursement. *See also* Pl.'s App. at 8–9 (DEA Agent's Manual § 6612.43) (providing for payments to informants, not coming from the AFF, and authorizing payment to an informant "for his services either in a lump sum or in staggered payments"); *Doe*, 48 Fed.Cl. at 498 (explaining that payments pursuant to DEA Agent's Manual § 6612.43 do not come out of the AFF). While the cases relying on this section of the manual, *see, e.g., Tracy*, 55 Fed.Cl. at 683; *Toranzo–Claure*, 48 Fed.Cl. at 583; *Doe*, 48 Fed.Cl. at 502; *Cruz–Pagan*, 35 Fed.Cl. at 62, are additional support for the lack of authority concerning any promise of awards based on indictments or asset seizures, they do nothing to undermine the authority to promise a salary and expenses from sources other than the AFF. Not only are the latter not awards, but the undisputed evidence in the record demonstrates that the payments to Mr. Brunner did not come from the AFF. *Compare* Def.'s App. at 18 (DEA Agent's Manual § 6612.45(C)) (requiring that when payments of awards are made from the AFF, "[t]he remarks section of the DEA–103 must contain a statement that the payment is made from the Assets Forfeiture Fund") *with* Pl.'s App. at 20–36 (the DEA–103 forms for the payments to Mr. Brunner, with no mention of the AFF in the remarks section); *see also* Def.'s App. at 4 (DEA Form 356 describing each payment to Mr. Brunner as "PE/PI").

The Court thus concludes that no publicly-available laws or regulations have been identified that would limit the RACs' implied authority to enter into contracts with confidential informants, promising a salary and reimbursement of expenses.

### c. Ratification of unauthorized agreement.

The plaintiff makes one additional attempt at finding authorization for the alleged contract terms promising the awards for indictments and seizures. *See* Pl.'s Reply at 15; Pl.'s Suppl. Br. at 1–2. He argues that the award promises were ratified by the DEA as reflected in two letters written after his deactivation—a letter to his counsel, from Mr.

---

17. The Court holds that potential contractors cannot be imputed with knowledge of the contents of this manual, under *Merrill*, merely because an individual might ultimately secure the release of certain provisions of the manual by making a request under the Freedom of Information Act, 5 U.S.C. § 552. *Cf. Sladek v. Bensinger,* 605 F.2d 899, 900 n. 1, 903 (5th Cir.1979) (requiring release of portions of DEA Agent's Manual). Purported restrictions or limitations that the government chooses not to publish are not publicly available, for purposes of applying *Merrill. See* 332 U.S. at 385, 68 S.Ct. 1.

McKinnon,[18] dated February 10, 1993, *see* Def.'s App. at 11; and a letter from then-Administrator of the DEA, Robert C. Bonner, to Senator Max Baucus, dated June 15, 1993.

■ To make the requisite showing to support ratification, Mr. Brunner must have evidence proving (1) the government received a benefit from the plaintiff's activities, *see Janowsky v. United States*, 133 F.3d 888, 891 (Fed.Cir.1998); Silverman, 679 F.2d at 870; and (2) government officials who had authority to contract had knowledge of the contract, *see United States v. Beebe*, 180 U.S. 343, 354, 21 S.Ct. 371, 45 L.Ed. 563 (1901), and accepted the plaintiff's offer, *see Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433–34 (Fed.Cir.1998). *See also Doe*, 58 Fed.Cl. at 486 (discussing both *Janowsky* and *Harbert/Lummus*).

The letter from Mr. McKinnon indicated the DEA's intentions as follows:

> At the conclusion of Mr. Brunner's testimony, he will be paid the remaining $2,000.00. In addition, we will process and submit Mr. Brunner's request for a percentage of the net proceeds realized from the sale of any assets seized in the investigation(s) in which he assisted in the Great Falls Resident Office.

Def.'s App. at 11. Plaintiff argues that this letter ratifies the agreement to pay the balance of an award relating to the indictment of one Michael "Goat" Snider. *See* Pl.'s Cross–Mot. Summ. J. at 10 (citing Nov. 23, 1992 voucher, Pl.'s App. at 36); *see also* Gustafson Letter (filed Apr. 8, 2005). Plaintiff also contends that this ratifies the agreement to pay him a percentage of the proceeds from assets seized and forfeited. *See* Pl.'s Suppl. Br. at 2.

■ "Ratification requires knowing acquiescence to an unauthorized agreement by a superior who has contracting authority." *Khairallah*, 43 Fed.Cl. at 64. Plaintiff argues the authority to contract is implied by the SAC's undisputed "authority to approve or pay rewards or expenses up to $25,000.00 per informant per quarter," Def.'s Resp. to Pl.'s Prop. Findings ¶ 12, which may be paid

from funds other than the AFF. *See* Pl.'s App. at 8 (DEA Agent's Manual § 6612.43(B) ("The SAC . . . is authorized to approve payments up to $25,000 per informant per quarter.")). The Court questions whether the SAC's power to authorize rewards is comparable to the RAC's power to advance payments of salary and expenses, for purposes of implied authority analysis, insofar as the former by its nature is based on a contingency beyond the informant's control—the seizure and forfeiture of a certain amount of property, or the indictment or conviction of a particular target.

■ But even assuming that the authority to bind the DEA to pay such awards could be implied by the SAC's related approval authority, the Court finds that plaintiff lacks evidentiary support for his ratification argument based on the McKinnon letter. Concerning the payment of a reward for assets seized and forfeited, the letter by its very terms fails to promise any such thing—the SAC merely stated that the award request would be "submitted and processed," not that it would be paid. And concerning the $2,000.00 payment promised, regardless of whether or not the required testimony took place (which is disputed), it is clear from the record that this payment is not the balance of some award, but rather Mr. Brunner's November salary. The November 23, 1992 voucher cited by plaintiff on its face stated that Mr. Brunner was paid $500 "for expenses incurred," and the "for Information and Expenses" box, not the "for Reward" box, was checked on the form. Pl.'s App. at 36. The voucher did not state that there was a balance remaining to be paid to Mr. Brunner, but instead that he "will be paid *in full $2,000* at the end/close of this case." *Id.* (emphasis added). Moreover, an earlier voucher indicates that Mr. Brunner was paid a $2,500 reward, on October 21, 1992, relating to the arrest of Snider. Pl.'s App. at 34. As $2,000 was the full amount of Mr. Brunner's monthly salary, he was already paid a reward concerning Snider, and the $500 on the November 23, 1992 voucher was for expenses, not an award, nothing in the record

---

18. This letter was signed by Mr. Young, over Mr. McKinnon's name. *See* Def.'s App. at 11.

supports his claim that the McKinnon letter promised the remnant of a reward.

■ The Bonner letter also falls far short of a ratification of the alleged contract. The letter does not indicate the Administrator's knowledge of, and acquiescence in, the alleged agreement. To the contrary, the Administrator stated he was "satisfied that DEA's Great Falls, Montana employees did not enter into the verbal agreements alleged to have been made" and stressed that payment of awards was "committed to the agency's informed discretion." Pl.'s App. at 42–43. No promise of payment is made, as Mr. Bonner wrote that, "if any asset seized as a result of Mr. Brunner's efforts is forfeited to the United States, DEA will submit to the responsible officials Mr. Brunner's request for a percentage of the net proceeds realized from the sale of the asset." *Id.* at 43. Nothing in the record supports plaintiff's ratification theory concerning the alleged promise to pay him awards for indictments or forfeitures.[19]

### D. Was there a Contract between Brunner and the DEA?

■ Having determined that the RAC, Mr. Yarbrough, possessed the requisite authority to bind the government concerning the salary and expenses of plaintiff—but that none of the DEA agents with whom plaintiff dealt had the authority to bind the government to pay awards for indictments or forfeitures, and that no evidence supports plaintiff's theory that the DEA ratified an agreement to pay him such awards—the Court now turns to plaintiff's cross-motion seeking to establish that a contract existed between him and the DEA. Plaintiff, with great specificity, testifies that he was promised, among other things, a salary of $2,000 per month, plus expenses. Def.'s App. at 21–22 (Brunner depo. tr. pp. 38–41); *cf. To-*

*ranzo–Claure,* 48 Fed.Cl. at 583 (finding "vague references" that "fai[l] to specifically describe the purported contracts" do not prove existence of contract).

Plaintiff relies on more than self-serving testimony. *Cf. Doe,* 58 Fed.Cl. at 483–84 (rejecting claim based solely on plaintiff's affidavit). The government concedes that it "intended to provide the Plaintiff, Terry C. Brunner, with $2,000.00 per month for the duration of his satisfactory cooperation with the DEA, as well as reimbursement for reasonable expenses connected with this performance of his informant duties." *See* Def.'s Resp. to Pl.'s Prop. Findings ¶ 11. It also concedes that $3,800 was paid to Mr. Brunner as *salary* during the period of his activation as a confidential informant. *Id.* ¶ 14. The evidence in the record confirms that Mr. Brunner was paid $3,800 in salary. *See* Pl.'s App. at 24, 26, 29, 32 (vouchers identifying payments to Mr. Brunner for salary). Consistent with Mr. Brunner's testimony concerning the size of his promised monthly salary, one DEA voucher shows he was paid $2,000 for his "October salary," Pl.'s App. at 32, another referenced his "monthly ($2,000) salary owed," *id.* at 29, and a third DEA voucher states he was paid $1,000 for "Salary½ of Sept." *Id.* at 24; *see also* Def.'s Resp. to Pl.'s Prop. Findings ¶ 14. Other DEA vouchers show that Mr. Brunner was compensated for expenses relating to his informant work. *See, e.g.,* Pl.'s App. at 21, 23, 27, 28, 30, 33, 36. These documents clearly corroborate Mr. Brunner's claim of an con-tract between himself and the DEA, as they show he was paid a $2,000 salary and expenses for the period in question in which he served as an informant. *Cf. Toranzo–Claure,* 48 Fed.Cl. at 582 (finding evidence of payments that "might demonstrate that some earlier contractual obligation of the government had been paid" did "little to establish" the alleged contract).

---

**19.** It is undisputed that the DEA accepted Mr. Brunner's assistance "which resulted in six (6) individuals pleading guilty and one (1) individual being found guilty at trial," Def.'s Resp. to Pl.'s Prop. Findings ¶ 24; *see also* Def.'s Answer ¶ 9; and that RAC Yarbrough had the authority to approve the payment of informants' salaries and expenses, *see* Pl.'s App. at 5 (Def.'s Resp. to Interrog. No. 13); *see also* Def.'s Resp. to Pl.'s

Prop. Findings ¶ 10. If Yarbrough promised to make these payments to Brunner, even if the former lacked contracting authority, then the DEA's acceptance of the benefits of this agreement ratified a contract to pay plaintiff's salary and expenses. *See Silverman,* 230 Ct.Cl. at 710; *see also City of El Centro,* 922 F.2d at 821 (explaining *Silverman*).

In response to this evidence demonstrating the elements of a contract, express or implied-in-fact, the government argues, with no supporting evidence, that "[a]ll payments to Mr. Brunner were discretionary, and no agreement was made regarding any payments." Def.'s Resp. to Pl.'s Prop. Findings ¶ 15; *see id.* ¶ 6 (merely stating "no such agreement was made or could have been made"); Def.'s Prop. Findings ¶ 5 (stating without support that, other than the cooperating individual agreement, "[n]o other agreements or contracts were executed or agreed to between Mr. Brunner and the Government"). Concerning the lack of any agreement to compensate plaintiff, it might be the case that if plaintiff had not identified the specific DEA agents present when his contract was allegedly made, as well as other witnesses, evidence to prove this negative would not be expected nor required. *See Cornejo–Ortega v. United States*, 61 Fed.Cl. 371, 373–74 (2004) (explaining that plaintiff could not identify the agents at his alleged meeting). But Mr. Brunner identified, by name, the three DEA agents he alleges were at the meeting (Messrs. Yarbrough, Hearon, and Williams), as well as two Great Falls police officers (Bryan Lockerby and Gregory Church) who, he claims, were also present. Def.'s App. at 21 (Brunner depo. tr. p. 39).[20]

The government acknowledges that "DEA officials that attended this meeting included Special Agents Gale Williams and Wes Hearon." Def.'s Prop. Findings ¶ 2. But it does not provide a declaration from either of these agents denying that an agreement to compensate Mr. Brunner was made at the meeting. *Cf. Henke*, 43 Fed.Cl. at 17 (affidavit of agent "assert[ing] that he made no contractual promises"); *Doe*, 58 Fed.Cl. at 484 (agents in affidavits "deny that they made promises"). The closest the defendant comes to such a showing is its submission, at the Court's request, of a declaration made by

Yarbrough responding to written interrogatories.[21] But rather than denying that the contract alleged by Mr. Brunner was made, Mr. Yarbrough merely states, "I do not recall any meetings where 'the retention of Plaintiff Brunner's services as a Regular Confidential Informant were discussed.'" Yarbrough Decl. ¶ 4. Of course, the events concerned in this lawsuit occurred nearly twelve years prior to the date of this declaration by Mr. Yarbrough. But this declaration hardly satisfies the government's burden of producing some evidence showing a dispute of facts on this point. With no testimony supporting the government's denial that a contract was entered with Mr. Brunner—nothing from agents Hearon or Williams or from the other law enforcement officers that plaintiff identified as present at the August 3 meeting—the government has failed even to make this into a "he said, they said" dispute.

The burden of persuasion rests on plaintiff to establish the existence of a contract, and the normal doubts concerning recollection and veracity would typically be a sufficient basis to conclude that the plaintiff's own statements might reasonably be disbelieved at trial. But in this case, additional evidence in the record, not rebutted or disputed, can only be construed to support the existence of an agreement to compensate Mr. Brunner. For instance, a December 16, 1992 memorandum from SAC McKinnon, signed by Donald W. Young, states that Yarbrough told plaintiff's lawyer that plaintiff "had been treated fairly and *paid per their agreement.* . . ." Def.'s App. at 9 (emphasis added). And the Court does not find it reasonable to infer that payments to Mr. Brunner, identified on the DEA's own forms as having been for "salary," *see* Pl.'s App. at 24, 26, 29, 32, were really discretionary payments, as the government argues. Not only is such position contrary to the common understanding of the word "salary,"[22] but it cannot be reconciled

---

**20.** Lockerby and Church are identified as police officers earlier in his testimony. *See* Def.'s App. at 20 (Brunner depo. tr. p. 35); *see also, e.g.,* Pl.'s App. at 26, 32 (DEA vouchers paid by Bryan E. Lockerby and witnessed by Gregory M. Church). Plaintiff also testified that either one of two other individuals, Jeff Grogh or Mark Wisser, was also present at the meeting.

**21.** This declaration was attached to "Defendant's Response to the Court's March 24, 2005 Order," filed April 1, 2005.

**22.** *See, e.g.,* 14 OXFORD ENGLISH DICTIONARY 387 (2d ed.1989) (salary defined as "1. Fixed payment made periodically to a person as compensation for regular work: now usually restricted to payments made for non-manual or non-mechanical

with the voucher dated September 18, 1992, in which the "remarks" section contained the following explanation: "Payment of balance of monthly ($2,000) salary owed for September 1992." Pl.'s App. at 29. If these payments were truly discretionary, nothing could have been *owed* to Mr. Brunner. The government could have shown that the fact of a contract between Mr. Brunner and the DEA was disputed by presenting affidavits from the people responsible for these various statements concerning salary owed, or payments per an agreement, explaining that the words were used in some idiosyncratic manner. It did not. The Court concludes that the government has failed to demonstrate a genuine dispute of material facts relevant to the formation of a contract between the DEA and Mr. Brunner. Plaintiff's motion for partial summary judgment is thus GRANTED insofar as it concerns the existence of a binding contract to pay plaintiff a monthly salary of $2,000, plus expenses—which may include relocation expenses. *See* Def.'s App. at 14 (DEA Agent's Manual § 6612.43(C), providing that the "DEA may absorb the expenses of relocation" for an informant and his family, from sources other than the AFF).

### III. CONCLUSION

For the foregoing reasons, the Court **GRANTS–IN–PART** and **DENIES–IN–PART** the government's motion for summary judgment. No contract with plaintiff was possible concerning a promise to pay awards for individuals indicted or property seized and forfeited, due to lack of contracting authority and lack of ratification. But the RAC, Yarbrough, possessed the implied authority to bind the DEA in a contract paying a salary and expenses to plaintiff. Plaintiff's cross-motion for partial summary judgment is also **GRANTED–IN–PART** and **DENIED–INPART**. As explained above, no contract could have been made with the plaintiff promising the awards of $2,500 for each indictment and twenty-five percent of the value of assets seized and forfeited. But the existence of a binding contract with the DEA, promising plaintiff a monthly salary of

$2,000 and a reimbursement of relocation expenses, has been established as beyond dispute. The parties shall file a Joint Status Report within thirty days of the date of this opinion and order, recommending a schedule for further proceedings.

**IT IS SO ORDERED.**

---

work"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2003 (1976) (salary defined as "1: fixed compensation paid regularly (as by the year, quarter, month, or week) for services: STIPEND").